811 F.2d 1524
 258 U.S.App.D.C. 335, 16 Soc.Sec.Rep.Ser. 327,
Medicare&Medicaid Gu 36,045
 SAMARITAN HEALTH SERVICE, an Arizona not-for-profit
organization, d/b/a Good Samaritan Hospital and
Desert Samaritan Hospital, Appellant,
v.
Otis R. BOWEN, Secretary of Health and Human Services.
 No. 85-6108.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 21, 1986.
Decided Feb. 6, 1987.
 
 Dennis M. Barry, Washington, D.C., with whom Elissa G. Baly and Albert C. Maule, Chicago, Ill., were on the brief, for appellant.
 Donald G. Kosin, Jr., Atty., Health and Human Services, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, and Joseph E. diGenova, U.S. Atty., Washington, D.C., were on the brief, for appellee.
 Before EDWARDS and WILLIAMS, Circuit Judges, and JOYCE HENS GREEN,* District Judge.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 WILLIAMS, Circuit Judge:
 
 
 1
 This appeal concerns a health care provider's entitlement to reimbursement under the Health Insurance for the Aged and Disabled Act (the "Act"), 42 U.S.C. Secs. 1395-1395zz (1982 & Supp. III 1985). The Act establishes a national health insurance plan for individuals who are 65 or older, disabled, or suffering from end-stage renal disease. To carry out this plan the United States reimburses health care providers for the reasonable costs of rendering certain services to Medicare beneficiaries. See 42 U.S.C. Secs. 1395f(b)(1), 1395x(v)(1)(A) (1982).
 
 
 2
 Petitioner Samaritan Health Service owns and operates Good Samaritan Hospital, a short-term acute-care hospital providing medical services to Medicare and non-Medicare beneficiaries. At issue is Good Samaritan's right to reimbursement for certain costs incurred in the operation of two of its facilities, namely units caring for sick newborns and an ultra-sophisticated emergency room. The Secretary determined that costs incurred in the operation of Good Samaritan's newborn units constituted "nursery" costs within the meaning of a regulation treating nursery costs as not "routine" and therefore nonreimbursable. Good Samaritan Hosp. v. Blue Cross & Blue Shield Ass'n/Blue Cross/Blue Shield, Inc., [1984-2 Transfer Binder] Medicare & Medicaid Guide (CCH) p 34,167 at 10,262 (Decision No. 84-D146 July 12, 1984). With respect to the emergency room, the Secretary determined that his Provider Reimbursement Manual (the "Manual"), by purportedly limiting reimbursement to only one type of "standby" fee, precluded compensation for fees calculated differently. Id. at 10,261-62. The District Court, sitting as an appellate court pursuant to 42 U.S.C. Sec. 1395oo(f)(1) (1982 & Supp. III 1985), affirmed the Secretary's determinations with respect to both facilities. Samaritan Health Service v. Heckler, 619 F.Supp. 713 (D.D.C.1985). For the reasons set forth below, we reverse.
 
 
 3
 * Good Samaritan operates four infant care units. Each is separate and provides a different level of care. The "A-3 Nursery" cares for healthy newborns while their mothers recover from delivery. The "Transitional Nursery" provides the same level of care as the A-3 Nursery except that newborns' vital signs are more frequently monitored. Neither the Transitional Nursery nor the A-3 Nursery contains any medical equipment of note, and the care they offer is essentially custodial and not medical.
 
 
 4
 The other two units care exclusively for sick newborns. The "ICU Unit" cares for critically ill newborns and the "Border Unit" cares for all other sick newborns requiring medical treatment. Unlike the A-3 and Transitional nurseries, these units possess sophisticated medical equipment and comprehensive medical staffs.
 
 
 5
 Each of Good Samaritan's infant care units is licensed by the state of Arizona as a nursery, and prior to 1975 Good Samaritan classified all four units as nurseries for Medicare purposes. In 1975, Good Samaritan reclassified the Border and ICU units as "pediatric" units in order to obtain Medicare reimbursement for a portion of the costs of providing routine services[1] in those units.
 
 
 6
 The Secretary's method of reimbursing providers is somewhat counter-intuitive. Rather than requiring providers to account for the routine services used by each Medicare patient, Medicare reimburses providers for a portion of their total cost of providing such services to all patients. See 42 C.F.R. Sec. 405.452 (1979). The provider's hospital-wide routine costs are aggregated to yield a "total cost of routine services" which is divided by the provider's "total number of inpatient days" to yield an "average cost per diem." The average cost per diem is then multiplied by the number of Medicare beneficiary inpatient days to yield the Medicare reimbursement.[2] This simple formula is complicated by the fact that the regulations specifically exclude certain costs, including "nursery costs," from a provider's total cost of routine services, and certain days, including "newborn days," from a provider's total number of inpatient days.[3] 42 C.F.R. Sec. 405.452(d)(7) (1979).
 
 
 7
 Although the Secretary initially accepted Good Samaritan's reclassification of the Border and ICU units as pediatric, he later reversed field, declaring their routine costs to be ineligible "nursery" costs. The dispute relates only to the Border and ICU units for the 1977, 1978 and 1979 cost years.
 
 
 8
 * The Secretary relies on a regulation excluding from a provider's total cost of routine services "the cost of services provided in intensive care units, coronary care units, and other special care inpatient hospital units as well as nursery costs." 42 C.F.R. Sec. 405.452(d)(7) (1979).[4] Neither the regulations governing Medicare reimbursement nor the Manual defines the term nursery as it is used here. In disposing of this matter, the Secretary claimed that the term nursery encompasses any unit caring exclusively for newborns. Petitioner asserts that the only reasonable definition is one based on the level of care provided by the unit at issue.[5] Although the Secretary's definition of the term nursery is not on its face implausible, we agree with petitioner that it conflicts with factual and legal realities. See Jewish Hosp. & Medical Center v. Heckler, 83 Civ. 4498, mem.op. (E.D.N.Y. June 30, 1986) (reaching same conclusion on similar facts); Transcript of an Extract of Proceedings, Rochester General Hosp. v. Heckler, No. 84-0056T (W.D.N.Y. April 8, 1985) (same).
 
 
 9
 The facts of this case demonstrate the arbitrary results that flow from the Secretary's definition of the term nursery. In addition to its four newborn units, Good Samaritan operates a "Pediatrics" unit which cares for both ill newborns and ill children. The Pediatrics unit renders care comparable to that provided in the Border and ICU units. The Secretary concedes that costs incurred in the Pediatrics unit are properly included in Good Samaritan's total cost of routine services, even though the Pediatrics unit treats newborns as well as children. Thus, under the Secretary's definition of the term nursery, inclusion of routine services for a sick newborn in Good Samaritan's total cost of routine services depends entirely upon the happenstance of whether that newborn received treatment in the Pediatrics unit or the Border or ICU units. This arbitrary application of the nursery cost exclusion has no legal basis.
 
 
 10
 Although the regulation relied upon by the Secretary does not define the term nursery, it does specifically define all of the other excluded units by the level of care provided: "To be considered an intensive care unit, coronary care unit or other special care inpatient hospital unit, the unit ... must be one in which the care required is extraordinary and on a concentrated and continuous basis...." 42 C.F.R. Sec. 405.452(d)(10) (1979). Thus, to sustain the internal logic of the regulations, nursery costs should not be excluded from "routine costs" where the unit in question provides a level of care identical to that of other units incurring "routine" costs.
 
 
 11
 The health care industry--whose methods and terminology are expressly made relevant by statute and regulation[6]--applies this same "level of care" criterion to differentiate between units caring for healthy newborns and units caring for sick newborns. The American Medical Record Association's Glossary of Hospital Terms (1974), cited by both parties as authoritative, defines a "hospital newborn inpatient" as "[a] hospital inpatient who was born in the hospital at the beginning of his current inpatient hospitalization." Id. at 19. The purpose of this definition is to distinguish newborn inpatients from other hospital inpatients. The definition itself, however reflects the Glossary's prior distinction between sick and healthy newborns. To qualify as a hospital inpatient, one must be a "hospital patient," id. at 18, and to be such one must be receiving "medical services," id. at 17. Thus, only sick newborns qualify as "hospital newborn inpatients." Healthy newborns located in "a special infant care unit ... maintained for babies who do not need or receive medical services" are not hospital patients but are properly classified as "hospital boarders." Id. at 19. Thus the Glossary asserts precisely the distinction urged by petitioner.
 
 
 12
 Perhaps most telling is the Secretary's own interpretation of the nursery cost exclusion regulation.
 
 
 13
 Newborn inpatient days excluded from the count [of total inpatient days] are only those days when an infant occupies a newborn bed in the nursery. An infant remaining in the hospital after the mother is discharged and not occupying a newborn bed in the nursery, or an infant delivered outside the hospital and later admitted to the hospital but not occupying a newborn bed in the nursery, or an infant admitted or transferred out of the nursery for an illness, should be included in the total inpatient days reported....
 
 
 14
 Manual, Part II, Sec. 304.3 Medicare & Medicaid Guide (CCH) p 9304C, at 3,149-12 (emphasis added). The critical language in this section is "admitted or transferred out of the nursery for an illness." Thus the Secretary himself, for purposes of computing the divisor of the fraction, assumes that a sick infant does not belong in "the nursery."
 
 
 15
 Finally, this court has recognized that whether a cost qualifies as part of a provider's total cost of routine services depends upon the level of care provided in the particular unit. "[T]he reason the section excludes newborns from the [routine cost reimbursement] calculation ... is that newborns do not receive any routine care and therefore do not generate any routine costs." Saint Mary of Nazareth, 718 F.2d at 468.[7] Healthy newborns who receive only custodial care generate no routine costs; sick newborns who receive hospital care do. It logically follows that the cost of providing routine services in the Border and ICU units must be included in Good Samaritan's total cost of routine services.
 
 
 16
 The Secretary urges that we must affirm if we can find a rational basis in the record for the agency's interpretation of the nursery exclusion provision, citing Diplomat Lakewood Inc. v. Harris, 613 F.2d 1009, 1018 (D.C.Cir.1979). Given the internal logic of the Secretary's own regulations and Manual, the terminology of the industry, and the decisions of this court, we find no rational basis for stretching the term nursery to encompass any unit caring exclusively for newborns irrespective of the level of care, and we find the Secretary's decision to do so arbitrary and capricious. 5 U.S.C. Sec. 706 (1982).
 
 B
 
 17
 The Secretary asserts that regardless of whether the Border and ICU units constitute nurseries, Good Samaritan's documentation of the units' costs failed to meet the standards of 42 C.F.R. Sec. 405.453 (1979). Because the District Court upheld the Secretary's classification of those units, it never reached this contention. We therefore remand the case to the District Court for resolution of the issue.
 
 II
 
 18
 The second issue concerns standby fees paid to physicians staffing Good Samaritan's Level I trauma center. A Level I trauma center is an emergency room caring for those patients so severely injured that survival depends upon receiving treatment within one hour of injury. Such centers must at all times have available the services of a surgeon and an anesthesiologist.[8]
 
 
 19
 To secure these services, Good Samaritan contracted with surgeons to be on call at all times and anesthesiologists to be on call at all times when Good Samaritan's staff anesthesiologists were unavailable. While on call the physicians had to remain within a 20-minute range of the hospital and make the trauma center patients their top priority. Good Samaritan paid the physicians a flat on-call fee for their availability ($200 for a 12-hour on-call period and $400 for a 24-hour on-call period) and permitted them to bill the individual patients they treated. During 1979 Good Samaritan incurred a total of $127,900 in on-call fees, all of which the Secretary deemed nonreimbursable.[9]
 
 
 20
 * The Medicare Act entitles Good Samaritan to reimbursement for "the reasonable cost" of providing services. 42 U.S.C. Sec. 1395f(b)(1) (1982).[10] The Act defines such cost as "the cost actually incurred," and also states that reasonable cost is to be "determined in accordance with regulations" of the Secretary. 42 U.S.C. Sec. 1395x(v)(1)(A) (1982).[11] The Secretary's regulations specify that reasonable costs include "normal standby costs." 42 C.F.R. Sec. 405.451(c)(3) (1979).
 
 
 21
 The Secretary bases his claim that Good Samaritan's on-call fees were not "normal standby costs" on a provision of the Manual, purporting to restrict reimbursement to a particular type of standby fee. "The unmet guarantee ... is the only type of financial arrangement in which the Medicare program will recognize provider standby costs for payments made to emergency room physicians."[12] Manual, Part I Sec. 2109.1, Medicare & Medicaid Guide (CCH) p 5889 (Mar.1978) (emphasis in original). Under an "unmet guarantee," as defined in the Manual,[13] the emergency room physician bills all patients for his or her services. If the amount billed falls below a certain minimum the hospital pays the physician the difference. Good Samaritan's on-call fees, which allow the physician a flat amount regardless of actual demands on his or her time (and therefore regardless of fees earned), do not qualify as unmet guarantees. Relying on Sec. 2109's exclusion of all reimbursement methods other than the unmet guarantee, the Secretary declared the fees nonreimbursable.
 
 
 22
 Since Sec. 2109 was promulgated without notice and comment, the Secretary cannot claim it as a substantive rule, see 5 U.S.C. Sec. 553 (1982) (requiring that substantive rules be promulgated by notice-and-comment rulemaking);[14] rather he identifies it as an interpretive rule. While substantive rules are typically characterized as having "the force and effect of law," see Batterton v. Francis, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977),[15] interpretive rules enjoy a lesser deference--doubtless in part because of the absence of public opportunity to comment. "Certainly regulations subject to the [Administrative Procedure Act] cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in that Act." Chrysler Corp. v. Brown, 441 U.S. 281, 313, 99 S.Ct. 1705, 1723, 60 L.Ed.2d 208 (1979). Any deference that an interpretive rule may claim depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors that give it power to persuade, if lacking power to control." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). See also Batterton v. Francis, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9.
 
 
 23
 The Secretary would apply Sec. 2109 categorically to preclude reimbursement for emergency room physician standby costs incurred under any compensation scheme other than an unmet guarantee. We conclude that he has attempted to endow Sec. 2109 with more force than is commanded by its inherent "power to persuade."
 
 
 24
 Indeed, its persuasiveness seems slight. Neither the Manual itself nor the Secretary's decision[16] suggests a reasoned basis for limiting reimbursement to the unmet guarantee. In this litigation the Secretary argues that an on-call fee such as Good Samaritan's gives the physician a "windfall." Secretary's Brief at 29-30. In fact, the two types of reimbursement simply differ in their allocation of risk. The "unmet guarantee" relieves the physician of risk almost entirely, assuring him of quite substantial revenue regardless of the number of patients he treats. In exchange for that guarantee, the physician gets nothing directly from the hospital on those occasions when patient fees meet or exceed the fixed amount. Good Samaritan's arrangement leaves the physician with the risk that he will receive little or nothing in the way of patient fees; in exchange, the physician receives the fixed sum no matter how lucrative the event proves. There is no reason to think that Good Samaritan's arrangement will produce any sort of windfall. On a busy night in the emergency room, a physician on call for Good Samaritan can keep his on-call fee, plus patient fees, and thus does better than under the unmet guarantee. But a slow evening produces the opposite result.
 
 
 25
 Somewhat contradictorily, the Secretary argues that as Good Samaritan did not keep records of physician billings it was "impossible to determine the extent to which Good Samaritan's fixed fees were in fact a necessary expense or an unnecessary windfall." Secretary's Brief at 30. But, even if we charitably interpret the "windfall" argument here as a claim that Good Samaritan's arrangement was inherently more costly than the expressly permitted method, such a claim could be established only by comparing adequate samplings of compensation under the various methods.[17]
 
 
 26
 Further, the Secretary's position in this case conflicts with both his earlier and later pronouncements. As originally promulgated in 1970, Sec. 2109 merely established criteria governing Medicare reimbursement for costs incurred under an unmet guarantee arrangement; it did not purport to limit reimbursement exclusively to such schemes. Provider Reimbursement Manual Revision ("PRMR") No. 18 (June 1970). That limitation first emerged in the Secretary's 1971 amendments to Sec. 2109. PRMR No. 41 (Aug.1971). See also PRMR No. 136 (Oct.1975); PRMR No. 198, Medicare & Medicaid Guide (CCH) p 5889 (Mar.1978) (both reaffirming the purported limitation). But even after these amendments, the agency's administrative law judges rebuffed attempts to limit reimbursement exclusively to costs incurred under minimum guarantee arrangements, and ordered reimbursement for costs incurred under other arrangements. Community Hosp. v. Blue Cross Ass'n/Blue Cross/Blue Shield, [1983-1 Transfer Binder] Medicare & Medicaid Guide (CCH), p 32,293 at 9435-37 (No. 82-D193, Sept. 3, 1982); D.M. Cogdell Memorial Hosp. v. Blue Cross Ass'n Group Hosp. Service, Inc., [1982 Transfer Binder] Medicare & Medicaid Guide (CCH), p 31,883 at 9379-80 (No. 82-D63, Mar. 3, 1982). Moreover, in 1980 and 1982 high-level officials of the Health Care Financing Administration, the division of Health and Human Services charged with overseeing Medicare reimbursement, issued pronouncements stating that Sec. 2109 did not preclude Medicare reimbursement for costs incurred under on-call fee arrangements essentially identical to the one here at issue. Record at 1971, 1981. Finally, in 1985 the Secretary amended Sec. 2109 to eliminate any pretense that the unmet guarantee was the only compensation arrangement generating reimbursable standby costs. PRMR No. 326, Medicare & Medicaid Guide (CCH) p 5889 (May 1985).[18]
 
 
 27
 Because Congress left open the question of when emergency room standby costs are reasonable (and hence reimbursable), we must accept the Secretary's interpretation of the Act on this matter so long as it is reasonable. Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). For the reasons set out above, Sec. 2109 fails to persuade us that it is a reasonable interpretation of the Act. In reaching this conclusion we rely in part on the Secretary's failure to manifest his interpretation in substantive rules adopted after proper notice and comment. See 42 U.S.C. Secs. 1395x(v)(1)(A) (1982). Conceivably his adoption of the same position in such a rulemaking might satisfy the Chevron standard. This possibility, however, is not before us. Section 2109, and the Secretary's arguments on its behalf in this litigation, provide no basis for treating Good Samaritan's on-call fees as ineligible for reimbursement under the Act and regulations.[19]
 
 B
 
 28
 In addition to determining that Sec. 2109 rendered Good Samaritan's on-call fees nonreimbursable, the Secretary concluded that "the on-call fee arrangements resulted in high levels of cost per patient." Good Samaritan Hosp. v. Blue Cross & Blue Shield Ass'n/Blue Cross/Blue Shield, Inc., [1984-1 Transfer Binder] Medicare & Medicaid Guide (CCH) p 34,167 at 10,261 (Decision No. 84-D146 July 12, 1984). We take this to be, in effect, a contention that the Secretary "found [a portion of the costs] to be unnecessary in the efficient delivery of needed health services" and therefore excludable. 42 U.S.C. Sec. 1395x(v)(1)(A) (1982). Under Sec. 1395x(v)(1)(A), the sanction for "high costs" would be nonreimbursement for the unduly high portion, not denial for the whole fee. In any event, the Secretary has failed to direct our attention to any record evidence supporting a finding that any portion of the fees, let alone the whole amount, was unnecessary in the efficient delivery of services.[20] We accordingly find that all of Good Samaritan's on-call fees incurred in the 1979 cost year are reimbursable.
 
 
 29
 * * *
 
 
 30
 The judgment below is reversed and the cause remanded for proceedings consistent herewith.
 
 
 31
 So ordered.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. Sec. 292(a)
 
 
 [1]
 Routine services are "the regular room, dietary, and nursing services, minor medical and surgical supplies, and the use of equipment and facilities for which a separate charge is not customarily made." 42 C.F.R. Sec. 405.452(d)(2) (1979)
 
 
 [2]
 This court has previously reduced this process to two rough equations:
 
 
 [1]
 total cost of routine services
 ------------------------------ = average cost per diem.
 total number of inpatient days
 
 
 [2]
 (average cost per diem) x (number of Medicare beneficiary
 inpatient days) = amount reimbursed.
 Saint Mary of Nazareth Hosp. Center v. Schweiker, 718 F.2d 459, 462 n. 7 (D.C.Cir.1983).
 
 
 [3]
 Where a regulation excludes a cost from the numerator of the reimbursement equation, it must also exclude the corresponding type of inpatient days from the denominator. Saint Mary of Nazareth Hosp. Center v. Schweiker, 718 F.2d 459 (D.C.Cir.1983)
 
 
 [4]
 The regulation also excludes "days of care in intensive care units, coronary care units, and other special care inpatient hospital units and newborn days" from the divisor of the reimbursement equation. 42 C.F.R. Sec. 405.452(d)(7) (1979)
 
 
 [5]
 Petitioner also argues that nursery costs must be included in the routine cost averaging pool to avoid a subsidization of Medicare beneficiaries in violation of 42 U.S.C. Sec. 1395x(v)(1)(A) (1982). See Vista Hill Foundation, Inc. v. Heckler, 767 F.2d 556, 563-66 (9th Cir.1985); Walter O. Boswell Memorial Hosp. v. Heckler, 749 F.2d 788, 794-95 (D.C.Cir.1984)
 The inclusion of routine costs for newborns in the computation of reimbursable Medicare costs may seem anomalous, in view of the remote prospect of newborns being Medicare beneficiaries. Even putting aside the possibility of newborns with end-stage renal disease, however, the Secretary's method of reimbursement makes such inclusion appropriate. His averaging principle includes routine costs without regard to use or non-use by Medicare patients. For example, he includes the expense of completing reports used only for Medicare patients, see id. at 798. This might result in non-Medicare patients subsidizing Medicare patients, if routine costs wholly unrelated to Medicare patients were excluded merely for lack of use by the latter. See id. at 798-99.
 Because we find the nursery cost exclusion inapplicable to the Border and ICU units, we do not reach petitioner's claim that the averaging principle requires inclusion of "routine costs" for newborns.
 
 
 [6]
 42 U.S.C. Sec. 1395x(v)(1)(A) (1982) directs the Secretary, in promulgating regulations defining reasonable cost, to consider the principles generally applied by national organizations in computing the amount of payment (to be made by persons other than the recipients of services) to providers of services
 
 
 [42]
 C.F.R. Sec. 405.406(a) (1979) provides that "[s]tandardized definitions ... which are widely accepted in the hospital and related fields are followed."
 
 
 [7]
 The issue before the court was whether the Secretary could properly count labor or delivery room days toward the divisor when he excluded labor and delivery costs from the numerator of the fraction. In concluding that he could not, we construed an identical version of the regulation before us, 42 C.F.R. Sec. 405.452(d)(7), as drawing the line between routine and other levels of care, taking the treatment of newborns as an example
 
 
 [8]
 A condition of participation in the Medicare program for hospitals having an emergency room of any level is that "[q]ualified physicians [be] regularly available at all times for the emergency service, either on duty or on call." 42 C.F.R. Sec. 405.1033(c)(2) (1979)
 
 
 [9]
 Were all of the on-call fees treated as belonging to a reimbursable category of costs, the portion for which Good Samaritan would have received actual reimbursement would have been approximately $28,000
 
 
 [10]
 The entitlement under Sec. 1395f(b)(1) is to the lesser of reasonable cost or customary charges, but the second alternative is not urged here
 
 
 [11]
 The Act provides for exclusion of "any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." Id
 
 
 [12]
 Subsequent to declaring Good Samaritan's on-call fees nonreimbursable, the Secretary amended Sec. 2109 to broaden the types of financial arrangements permitted with respect to emergency room physician standby fees. Manual, Part I Sec. 2109.1, Medicare and Medicaid Guide (CCH) p 5889 (May 1985). We of course address the earlier version
 
 
 [13]
 See Manual, Part I Sec. 2109, Medicare & Medicaid Guide (CCH) paragraphs 5889-5891D (Mar.1978)
 
 
 [14]
 Effective January 28, 1971 the Secretary waived his right to rely on the exclusion set out in 5 U.S.C. Sec. 553(a)(2) (1982), which excepts matters "relating to ... public ... grants, benefits or contracts" from the normal requirement of notice and comment. 36 Fed.Reg. 2532 (1971). Although Sec. 2109 was originally promulgated in June 1970, it went through a succession of revisions, and it does not appear to us that any version earlier than that of August 1971 could reasonably be deemed to require use of the unmet guarantee method. See infra pp. 1530-31
 
 
 [15]
 Despite the apparent sweep of the quoted language, even substantive rules may be overturned if, in the court's judgment, the officer "exceeded his statutory authority or if the regulation is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " Id. at 426, 97 S.Ct. at 2406
 
 
 [16]
 Good Samaritan Hosp. v. Blue Cross & Blue Shield Ass'n/Blue Cross/Blue Shield, Inc., [1984-1 Transfer Binder] Medicare & Medicaid Guide (CCH) p 34,167 at 10,261-62 (Decision No. 84-D146 July 12, 1984)
 
 
 [17]
 Moreover, it seems doubtful whether under the statute a tendency to generate excess costs would constitute a sufficient reason for excluding all costs incurred under a particular physician reimbursement method. See infra Part II.B
 
 
 [18]
 As amended, Sec. 2109 now permits minimum guarantees, flat-fee arrangements, and anything in between, but in all cases imposes certain procedural and operational limitations, e.g., physicians must be on premises at all times, costs must be documented in certain manner, etc. See Manual, Part I Sec. 2109 Medicare & Medicaid Guide (CCH) p 5889 (May 1985)
 
 
 [19]
 The Secretary supported his rejection of Good Samaritan's on-call fees by asserting that Good Samaritan "has not demonstrated that the on-call fee payments in question were a common and accepted practice." Good Samaritan Hosp. v. Blue Cross & Blue Shield Ass'n/Blue Cross/Blue Shield, Inc., [1984-1 Transfer Binder] Medicare & Medicaid Guide (CCH) p 34,167 at 10,261 (Decision No. 84-D146 July 12, 1984). In light of the Secretary's own prior approval of similar fee arrangements, Record at 1971, 1981, it is hard to grasp his basis for placing such a burden on the hospital. In any event, he does not press the point on appeal
 
 
 [20]
 To the contrary, the record reflects that a hospital in a neighboring city paid its emergency room physicians $1,800 per 24-hour on-call period under an arrangement identical to Good Samaritan's. Record at 1983-85