61 F.3d 170
 64 USLW 2072, 48 Soc.Sec.Rep.Ser. 450,
Medicare & Medicaid Guide P 43,994,
Medicare & Medicaid Guide P 44,022
 ELIZABETH BLACKWELL HEALTH CENTER FOR WOMEN; Greater
Philadelphia Women's Medical Fund; CHOICE, on behalf of
themselves and the Medicaid-eligible women of the
Commonwealth of Pennsylvania to whom they provide financial,
health care and counseling services, Appellees,
v.
Catherine Baker KNOLL, Treasurer of the Commonwealth of
Pennsylvania, in her official capacity; Karen F. Snider,
Secretary of Public Welfare of the Commonwealth of
Pennsylvania, in her official capacity; Sherry Knowlton,
Deputy Secretary of the Office of Medical Assistance of the
Commonwealth of Pennsylvania, in her official capacity;
Robert P. Casey, Governor of the Commonwealth of
Pennsylvania, in his official capacity, and their successors.
Catherine Baker Knoll, Karen F. Snider, Sherry Knowlton and
Robert P. Casey, Appellants.
 No. 94-1954.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 13, 1995.
Decided July 25, 1995.
Judge Nygaard's Dissent Amended Aug. 3, 1995.
Rehearing In Banc Denied Aug. 24, 1995.
 
 Sandra W. Stoner (argued), Office of Atty. Gen. of Pa., Harrisburg, PA, for appellants Catherine Baker Knoll, Karen F. Snider, Sherry Knowlton, Robert P. Casey.
 Mary A. McLaughlin (argued), Dechert, Price & Rhoads, Philadelphia, PA, for appellees Elizabeth Blackwell Health Center for Women, Greater Philadelphia Women's Medical Fund, CHOICE, on behalf of themselves and the Medicaid-eligible women of Com. of Pa. to whom they provide financial, health care and counseling services.
 Frank W. Hunter, Asst. Atty. Gen., Michael R. Stiles, U.S. Atty., Barbara C. Biddle, Alfred Mollin, Attys., Appellate Staff, Civ. Div., Washington, DC, for U.S. as amicus curiae.
 Before: COWEN, NYGAARD and ALITO, Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 The Elizabeth Blackwell Health Center for Women, a comprehensive reproductive health care facility that provides first-trimester abortions, the Greater Women's Medical Fund, a non-profit agency that provides financial assistance to low-income women in order to obtain abortions, and CHOICE, a telephone hot-line which provides information and referrals to its callers on many issues, including family planning and abortion (collectively, the "Providers"), ask this Court to declare invalid and enjoin the enforcement of sections 3215(c) and 3215(j) of the Pennsylvania Abortion Control Act, 18 Pa. Cons.Stat.Ann. Secs. 3201-3220 (1983 & Supp.1994), Pennsylvania's reporting and physician certification requirements for publicly-funded abortions under the Medicaid program. The Governor of Pennsylvania, the State Treasurer, the Secretary of the Pennsylvania Department of Public Welfare, and the Deputy Secretary for Medical Assistance (collectively, "the Commonwealth") appeal from the order of the district court granting the Providers' motion for summary judgment. The district court based its holding on the Providers' claim that the Pennsylvania statute is preempted by the Hyde Amendment.
 
 
 2
 We conclude that the Secretary of Health and Human Services is owed deference regarding her interpretation of the Hyde Amendment mandates. Because the Secretary has determined that reporting requirements are permissible under the Medicaid Act, as modified by the Hyde Amendment, only if they contain a waiver provision, and since the Pennsylvania Abortion Control Act contains no such provision, we find Sec. 3215(j) of the Pennsylvania statute directly in conflict with federal law, and thus, invalid to the extent that it conflicts with the Secretary's interpretation. Furthermore, because the second-physician certification requirement pursuant to Sec. 3215(c) is contrary to a federal regulation, it is also invalid to the extent that it goes beyond the scope of that regulation.
 
 I.
 
 3
 This action concerns Title XIX of the Social Security Act, commonly known as the Medicaid program, 42 U.S.C. Secs. 1396-1396u (1988 & Supp. V 1993). The purpose of the Medicaid program is to help provide medical treatment for low-income people. Under the program, the state receives federal financial assistance in return for administering a Medicaid program that the state develops within parameters established by federal law and regulations. 42 C.F.R. Sec. 430.0 (1994).
 
 
 4
 Establishment of a Medicaid program is voluntary on the part of each state. While states are not obligated to participate in the Medicaid program, each state that chooses to do so is required to develop its own state plan which must be approved by the Secretary. In order to receive federal funds, a state's plan must conform, both on its face and as applied, with various federal requirements. 42 U.S.C. Sec. 1396a, 1396c; see Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980); New Jersey v. Department of Health and Human Services, 670 F.2d 1284, 1286 (3d Cir.), cert. denied, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982).
 
 
 5
 Under Title XIX, certain categories of medical care are mandatory, and must be provided by every state Medicaid plan, while other categories of care are optional, and each state has the discretion to cover the service. See 42 U.S.C. Sec. 1396a(a)(10). By law, states are required to fund medically necessary physician services. 42 U.S.C. Secs. 1396a(a)(10)(A), 1396d(a). Participating states must establish eligibility requirements that are "consistent with the objectives" of Title XIX. 42 U.S.C. Sec. 1396a(a)(17). "Title XIX's broadly stated primary objective [is] to enable each State, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services." Beal v. Doe, 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977) (citing 42 U.S.C. Secs. 1396, 1396a(a)(10)). "A further objective is that policies governing eligibility be in the 'best interests' of the recipient." Hodgson v. Board of County Commissioners, County of Hennepin, 614 F.2d 601, 607 (8th Cir.1980) (citing 42 U.S.C. Sec. 1396a(a)(19); 45 C.F.R. Sec. 206.10(a)(11)). The state must also provide safeguards to assure that its Medicaid plan will be administered "in a manner consistent with simplicity of administration." 42 U.S.C. Sec. 1396a(a)(19). On the other hand, the state must "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization." 42 U.S.C. Sec. 1396a(a)(30)(A).
 
 
 6
 In addition, federal regulations require that each covered service be "sufficient in amount, duration, and scope to reasonably achieve its purpose," 42 C.F.R. Sec. 440.230(b) (1994), and mandate that states "may not arbitrarily deny or reduce the amount, duration, or scope of a required service ... to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. Sec. 440.230(c).
 
 
 7
 If, after a hearing, the Secretary finds that an approved state plan no longer complies with the provisions of the Medicaid Act, or that the state had failed to comply substantially with any applicable federal requirement, the Secretary may notify the state that federal financial participation will be withheld or limited. 42 U.S.C. Sec. 1396c.
 
 
 8
 In 1976, Congress passed what is commonly called the Hyde Amendment, which prohibits federal reimbursement for abortions except in the narrow circumstances that Congress deems to be medically necessary. Since 1976, Congress has added the Hyde Amendment to annual appropriations bills for the U.S. Department of Health and Human Services ("HHS"). While its provisions have varied to some degree from year to year, the effect of the Hyde Amendment has been to withdraw federal funding under Medicaid for most abortions.[1]
 
 
 9
 The Hyde Amendment for fiscal year 1994 permitted, for the first time since 1981, expenditure of federal funds for abortions when "the pregnancy is the result of an act of rape or incest" as well as when "necessary to save the life of the mother." Pub.L. No. 103-112, Sec. 509, 107 Stat. 1082, 1113 (1993). The full version of the 1994 Hyde Amendment provides:
 
 
 10
 None of the funds appropriated under this Act shall be expended for any abortion except when it is made known to the Federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest.
 
 Id.[2]
 
 11
 This Court has previously held that the Medicaid statute, as modified by the Hyde Amendment, requires participating states to fund those abortions for which federal reimbursement is available. Roe v. Casey, 623 F.2d 829, 836-37 (3d Cir.1980). See also Hodgson, 614 F.2d at 605; Preterm, Inc. v. Dukakis, 591 F.2d 121, 134 (1st Cir.), cert. denied, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1057 (1979). We are bound by that precedent here. Accordingly, under Medicaid, funding for rape and incest abortions is mandatory for participating states.
 
 
 12
 The 1994 Hyde Amendment was reported out of committee with a provision requiring women seeking reimbursement for rape and incest abortions to report the crimes to the appropriate law enforcement officials. 139 Cong.Rec. H4304 (daily ed. June 30, 1993) (Sec. 207). However, a point of order was raised that the Hyde Amendment language violated parliamentary procedure of the House of Representatives, which prohibits attempts to "legislate" on an appropriations bill. The point of order was conceded and the entire amendment stricken from the bill. 139 Cong.Rec. H4307-08.
 
 
 13
 The Secretary of HHS has delegated her authority to oversee and enforce the Medicaid program to the Health Care Financing Administration ("HCFA"). 49 Fed.Reg. 35,247, 35,249 (1984). HCFA has promulgated a regulation that provides:
 
 
 14
 [Federal funding] is available in expenditures for an abortion when a physician has found, and certified in writing to the Medicaid agency, that on the basis of his professional judgment, the life of the mother would be endangered if the fetus were carried to term.
 
 
 15
 42 C.F.R. Sec. 441.203 (1994).
 
 
 16
 In addition, on December 28, 1993, HCFA issued a directive to state Medicaid directors, explaining:
 
 
 17
 The purpose of this letter is to notify [state Medicaid directors] about a recent Congressionally enacted revision to the "Hyde Amendment" which affects the Medicaid program and to tell you how this revision in the law is to be implemented.
 
 
 18
 ....
 
 
 19
 As with all other mandatory medical services for which Federal funding is available, States are required to cover abortions that are medically necessary. By definition, abortions that are necessary to save the life of the mother are medically necessary. In addition, Congress this year added abortions for pregnancies resulting from rape and incest to the category of medically necessary abortions for which funding is provided. Based on the language of this year's Hyde Amendment and on the history of Congressional debate about the circumstances of victims of rape and incest, we believe that this change in the text of the Hyde Amendment signifies Congressional intent that abortions of pregnancies resulting from rape or incest are medically necessary in light of both medical and psychological health factors. Therefore, abortions resulting from rape or incest should be considered to fall within the scope of services that are medically necessary.
 
 
 20
 The definition of rape and incest should be determined in accordance with each State's own law. States may impose reasonable reporting or documentation requirements on recipients or providers, as may be necessary to assure themselves that an abortion was for the purpose of terminating a pregnancy caused by an act of rape or incest. States may not impose reporting or documentation requirements that deny or impede coverage for abortions where pregnancies result from rape or incest. To insure that reporting requirements do not prevent or impede coverage for covered abortions, any such reporting requirement must be waived and the procedure considered to be reimbursable if the treating physician certifies that in his or her professional opinion, the patient was unable, for physical or psychological reasons, to comply with the requirement.
 
 
 21
 ....
 
 
 22
 By March 31, 1994, all States must ensure that their State Plans do not contain language that precludes [federal funding] for abortions that are performed to save the life of the mother or to terminate pregnancies resulting from rape or incest.
 
 
 23
 Letter, from Sally K. Richardson, Director, Medicaid Bureau, to All State Medicaid Directors (Dec. 28, 1993) (emphasis added), App. at 92-93.[3]
 
 
 24
 However, under the Pennsylvania Abortion Control Act, no federal or state funds can be provided for the termination of pregnancies caused by rape or incest unless the state agency: (1) obtains a statement from the physician performing the abortion that the woman was a victim of rape or incest and that she personally reported the crime to the appropriate law enforcement agency together with the name of the offender; (2) obtains from the physician the woman's signed statement to that effect; and (3) verifies the reporting of the crime with the appropriate law-enforcement agency. 18 Pa.Cons.Stat.Ann. Sec. 3215(j) (Supp.1994).[4] The Pennsylvania Abortion Control Act does not contain a waiver provision.
 
 
 25
 In addition, in cases where carrying the fetus to term would endanger the life of the mother, the Pennsylvania Act provides that no state or federal funds can be expended unless the danger is certified by a physician who is not the physician who will perform the abortion and who has no financial interest in the procedure. 18 Pa.Cons.Stat.Ann. Sec. 3215(c) (Supp.1994).[5]
 
 
 26
 The Providers commenced this challenge to sections 3215(c) and 3215(j) of the Pennsylvania Abortion Control Act, on their own behalf and on behalf of Medicaid-eligible rape and incest victims and Medicaid-eligible women whose lives are endangered but who cannot obtain second-physician certification. The Providers argued in the district court that the Commonwealth's reporting and certification requirements are inconsistent with the Hyde Amendment, and therefore invalid under the Supremacy Clause of the United States Constitution.[6]
 
 
 27
 The district court granted the Providers' motion for summary judgment on the Supremacy Clause claim. Elizabeth Blackwell Health Center for Women v. Knoll, No. 94-0169, slip op. at 5, 1994 WL 512365 (E.D.Pa. Sept. 15, 1994). Relying on our decision in Roe v. Casey, 623 F.2d 829 (3d Cir.1980), the district court first acknowledged that Pennsylvania must cover all abortions for which federal reimbursement is provided under the Hyde Amendment. The court then reasoned:
 
 
 28
 whereas the Hyde Amendment restricts abortion funding to cases of rape or incest, or where continuation of the pregnancy would endanger the life of the mother, the Pennsylvania statute imposes additional limitations. To the extent of these additional limitations, therefore, the Pennsylvania statute is invalid, under familiar pre-emption principles.
 
 
 29
 Id. at 3.
 
 
 30
 The district court also found support for its holding in the fact that "the same kinds of reporting and certification requirements set forth in the Pennsylvania statute had appeared in earlier versions of the Hyde Amendment. They were removed in the current version, and efforts by abortion opponents to include them were rejected by Congress." Id. at 4 (citation omitted). The district court thus concluded that the legislative history indicates congressional intent to eliminate the reporting requirements. Id. at 5. Further, the district court also held that the crime-fighting and other interests advanced by the Commonwealth to justify the challenged provisions were inconsistent with the purposes of the Medicaid Act and were therefore impermissible. Id. at 4.
 
 
 31
 The district court enjoined the Commonwealth from enforcing sections 3215(c) and 3215(j) of the Pennsylvania Abortion Control Act. This appeal followed. This Court granted the Commonwealth's motion to stay the order of the district court pending appeal, and the Providers' request to expedite this appeal. We requested the Secretary of HHS to address as amicus the issue of the extent to which a state can require reporting and second-physician certification under the Medicaid Act and the Hyde Amendment in order for a woman to be entitled to an abortion.II. REPORTING REQUIREMENTS FOR RAPE OR INCEST
 
 
 32
 The Secretary of HHS, who administers the Medicaid program, has interpreted the Medicaid statute as modified by the 1994 Hyde Amendment, to provide that, absent a waiver provision, reporting requirements for rape or incest abortions unduly impede or deter a woman's exercise of her right to the medically necessary procedure. Letter, (Dec. 28, 1993), App. at 93; Letter, (Mar. 25, 1994), App. at 117. The Secretary does not regard reporting requirements as per se invalid. Id. If this judgment is a reasonable exercise of the Secretary's discretion, it is entitled to due deference. Our inquiry is therefore focused upon whether the Secretary's interpretation warrants our deference.
 
 A.
 
 33
 The Commonwealth disputes both the Secretary's and the district court's interpretations of the Hyde Amendment mandates regarding reporting requirements. The Commonwealth maintains that its requirements are valid and should be upheld in their entirety.
 
 
 34
 The Commonwealth acknowledges that under the Medicaid program, states are free to participate or not as they see fit, but if a state does elect to participate, it must comply with the conditions that Congress has set. The Commonwealth, however, citing Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981), argues that in setting those conditions, "Congress [must] speak with a clear voice." It contends that a program like Medicaid:
 
 
 35
 is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.... There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. [Pennhurst, 451 U.S. at 17, 101 S.Ct. at 1540 (citation and footnote omitted).]
 
 
 36
 The Commonwealth maintains that on its face, the 1994 Hyde Amendment is a simple prohibition on the use of federal money for certain specified purposes. It sets neither requirements nor prohibitions on the states; it says nothing explicit about reporting or certification procedures. The Commonwealth concludes that the principles articulated in Pennhurst, when applied to this case, require that the district court's holding be reversed because it cannot reasonably be said that Congress has "unambiguously" forbidden reporting and certification requirements such as those contained in the Pennsylvania law.
 
 
 37
 The Commonwealth's reliance on Pennhurst is misplaced. Pennhurst involved the obligations of states under the federal Developmentally Disabilities Assistance and Bill of Rights Act, 42 U.S.C. Secs. 6000-6081 ("DDABRA"). In reversing our holding that the "bill of rights" provision of the DDABRA created enforceable rights and obligations, the Supreme Court found no evidence that Congress intended to condition the grant of federal funds on the states' "assum[ing] the high cost of providing 'appropriate treatment' in the 'least restrictive environment' to their mentally retarded citizens." 451 U.S. at 18, 101 S.Ct. at 1540. The Court reasoned that because Congress failed to speak clearly regarding the state's obligations, it could not "fairly say that the State could make an informed choice" about participation in the joint program. Id. at 25, 101 S.Ct. at 1544.
 
 
 38
 Here, the Medicaid Act by its terms requires state Medicaid plans to cover all medically necessary services that fall within the mandatory areas of care. See 42 U.S.C. Sec. 1396a(a)(10)(A). Moreover, nearly fifteen years ago, we made clear in Roe v. Casey, that states participating in the Medicaid program must provide the abortion services that are enumerated in the Hyde Amendment. 623 F.2d at 836-37. The 1994 Hyde Amendment plainly puts participating states on notice of their obligations to fund abortions where necessary to save a woman's life or where the pregnancy is the result of rape or incest. Accordingly, the Commonwealth was given clear notice that, if it elected to continue to participate in the Medicaid program, it was obligated to provide funding for such abortions. Furthermore, any participating state should have realized that reporting requirements could be so onerous as to defeat Congress' intent that Medicaid funding be provided for the categories of abortions in question. Unlike the claims of the defendants in Pennhurst, the Commonwealth cannot reasonably claim that it was unaware of its obligations under the Medicaid Act, as modified by the Hyde Amendment and its implementing regulations. As such, the Secretary is reasonable in interpreting the Hyde Amendment to prohibit reporting requirements that operate as additional coverage requirements to deny or impede some women from receiving the mandated abortion services.
 
 
 39
 The Commonwealth further maintains that other provisions of Title XIX authorize the challenged provisions. Participating states are required to adopt "reasonable standards ... for determining eligibility for and the extent of medical assistance." 42 U.S.C. Sec. 1396a(a)(17). States are likewise required to adopt "such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. Sec. 1396a(a)(19). Additionally, states must "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization." 42 U.S.C. Sec. 1396a(a)(30)(A). Moreover, the current version of the Hyde Amendment requires states to "make known" to the Secretary that the abortion for which funding is sought is one in which the life of the mother is endangered or where the pregnancy resulted from rape or incest. The Commonwealth argues that Pennsylvania's reporting and certification procedures further these statutory mandates.
 
 
 40
 In her amicus brief, the Secretary acknowledges that Congress intended that states be allowed flexibility in developing procedures for administering their statutory obligations under the Medicaid statute and their state plans. Amicus Brief at 20 (citing Schweiker v. Hogan, 457 U.S. 569, 590-93, 102 S.Ct. 2597, 2610-11, 73 L.Ed.2d 227 (1982) (a state has the option to provide partial benefits to the medically needy); Mississippi Hospital Ass'n, Inc. v. Heckler, 701 F.2d 511, 515 (5th Cir.1983) (Congress intended states to be free to experiment with methods and standards of payment under their Medicaid plans)). The Secretary's regulations have long recognized that states have discretion to impose reasonable coverage limits, consistent with the objectives of the Act, on the amount, duration, and scope of services, particularly with respect to ensuring "utilization control." 42 C.F.R. Sec. 440.230(b), (d). Indeed, the Secretary acknowledges that while states are not required to adopt reporting requirements, properly tailored reporting requirements can serve the purposes of the Medicaid Act and the Hyde Amendment.
 
 
 41
 However, in reconciling these eligibility requirements of the Medicaid statute with the language and history of the Hyde Amendment, and with the other purposes of the Medicaid program, the Secretary maintains that state-established reporting requirements "may not serve as an additional coverage requirement to deny or impede payment for abortions where pregnancies result from rape or ince[s]t." Letter, (Mar. 25, 1994), App. at 117. The Secretary has thus concluded that reasonable reporting requirements are valid only if they contain a waiver provision.
 
 B.
 
 42
 The Providers argue that the district court correctly held that the Supremacy Clause requires the invalidation of Pennsylvania's reporting and second-physician certification requirements because they directly conflict with federal law. The Supremacy Clause requires invalidation of any state constitutional or statutory provision that conflicts with federal law, see Reynolds v. Sims, 377 U.S. 533, 584, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964), and compels compliance by participants in Title XIX federal aid programs with federal law and regulations. King v. Smith, 392 U.S. 309, 316-17, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968); Roe v. Casey, 623 F.2d at 837.
 
 
 43
 The Providers maintain that the district court properly relied on Roe v. Casey in holding that all state Medicaid programs must fund all abortions for which federal funds are available. In Roe v. Casey, we invalidated an earlier version of Pennsylvania's Medicaid funding restriction that proscribed coverage of abortions except when necessary to save the life of the pregnant woman. The then-applicable Hyde Amendment, like the 1994 Hyde Amendment, permitted the expenditure of funds for abortion where a pregnancy resulted from rape or incest, as well as in life-threatening circumstances. We reasoned:
 
 
 44
 Title XIX, as now modified [by the current Hyde Amendment], requires the states to fund abortions in two categories: where the mother is endangered and where the pregnancy was the result of rape or incest. Pennsylvania ... would not fund the second category. Because Pennsylvania's statutes are not consistent with the modified Title XIX it is clear that, as written, they cannot stand.
 
 
 45
 Id. at 836-37.
 
 
 46
 The Providers argue that the district court correctly concluded that Pennsylvania's effort to restrict its Medicaid coverage of abortion to cases of reported rape and incest and dually-certified life endangerment runs directly contrary to Roe v. Casey's mandate that Pennsylvania must fund all abortions for which federal funds are available. According to the Providers, the Pennsylvania reporting requirements would be invalid under Roe v. Casey even if they contained a waiver provision.
 
 
 47
 We agree that Roe v. Casey holds that the Hyde Amendment establishes a mandatory floor of required services, below which states may not fall. Under its ruling, all women who are eligible must receive the benefits that have been made available to them by Congress. The question with which we are faced today focuses on the issue of eligibility requirements that are utilized by states to determine whether a woman is entitled to the services enumerated in the Hyde Amendment. Roe v. Casey indicates that these eligibility requirements cannot be so onerous that they inhibit or deter women who are eligible to receive the abortion services from receiving them. Roe v. Casey does not, however, per se invalidate all reporting requirements used for eligibility purposes.
 
 
 48
 The Providers further argue that the legislative history provides a clear indication of congressional intent to prohibit the reporting and certification requirements contained in the Pennsylvania statute. The Providers note that in past versions of the Hyde Amendment, Congress had specifically included reporting requirements for rape and incest victims, and contained second-physician requirements for abortions in cases of severe and long-lasting physical health damage. See Pub.L. No. 96-536, Sec. 109, 94 Stat. 3166, 3170 (1980) (1981 Hyde Amendment) (providing funding for rape or incest victims "when such rape has been reported within seventy-two hours to a law enforcement agency or public health service"); Pub.L. No. 96-123, Sec. 109, 93 Stat. 923, 926 (1979) (1980 Hyde Amendment) (providing Medicaid funded abortions for rape or incest victims "when such rape or incest has been reported promptly to a law enforcement agency or public health service"); Pub.L. No. 95-480, Sec. 210, 92 Stat. 1567, 1586 (1978) (1979 Hyde Amendment) (restricting Medicaid funding in cases of severe and long-lasting health damage to those cases "so determined by two physicians"); Pub.L. No. 95-205, Sec. 101, 91 Stat. 1460 (1977) (1978 Hyde Amendment) (same). Additionally, in 1993, Congress considered but rejected a version of the 1994 Hyde Amendment that contained such a requirement. See 139 Cong.Rec. H4304 (daily ed. June 30, 1993) (showing previous version of amendment which included reporting requirement). The Providers contend that the district court properly inferred that, in repudiating previous versions of the Hyde Amendment, Congress clearly intended to eliminate provisions such as those at issue here.
 
 
 49
 The district court's reading of the legislative history goes too far. While Congress clearly no longer requires the states to implement reporting and certification procedures, it does not follow that states are now forbidden to have them. At most, the rejection of the earlier versions of the Hyde Amendment is a sign that Congress did not wish to mandate reporting requirements on the states. Cf. John Hancock Mutual Life Ins. Co. v. Harris Trust & Sav. Bank, --- U.S. ----, ----, 114 S.Ct. 517, 524, 126 L.Ed.2d 526 (1993) (courts are guided by the statute's words, not by discarded draft legislation). Moreover, we note that Congress' rejection of the reporting requirements for the 1994 Hyde Amendment was expressly based on procedural considerations. See 139 Cong.Rec. H4307-08. A rejection on procedural grounds provides no basis for any inference regarding Congress' views about the substantive provisions of the legislation. We are therefore left with no guidance from the legislative history.
 
 C.
 
 50
 We are thus faced with competing interests within the Medicaid statute as amended by the 1994 Hyde Amendment. On one hand, the Pennsylvania reporting requirements that require a physician's averment setting forth that the woman signed a statement that her pregnancy was the result of rape or incest can be defended on the ground that they further the state's interest under the Hyde Amendment in being able to "make known" to the Secretary that an abortion was performed upon a woman's representation that the pregnancy was the result of rape or incest. The requirement under Pennsylvania law that a woman report the rape or incest to law enforcement agencies can be defended as an attempt to ensure that the woman's representations are true as a part of the state's obligation to "safeguard against unnecessary utilization." 42 U.S.C. Sec. 1396a(a)(30)(A).
 
 
 51
 On the other hand, however, the Supreme Court has held that a state law that establishes benefit eligibility criteria for a federal program that are more restrictive than the criteria established by Congress is invalid. King v. Smith, 392 U.S. 309, 333, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968). Likewise, our decision in Roe v. Casey sets a mandatory floor of services that must be provided by the states under the Medicaid Act, as modified by the Hyde Amendment, which cannot be undermined by onerous reporting requirements. Furthermore, Sec. 1396a(a)(19) requires that the state provide safeguards to assure that the plan will be administered "in a manner consistent with simplicity of administration and the best interests of the recipients."[7]
 
 
 52
 It can reasonably be argued that the Pennsylvania reporting requirements are inconsistent with this mandate because they create a formidable barrier for some women who would otherwise be eligible to obtain abortions in cases of rape and incest. The Pennsylvania statute creates numerous hurdles for rape and incest victims: (1) a woman must personally report the incident of rape or incest to state law enforcement authorities, together with the name of the offender; (2) physicians are required to aver that they have obtained a signed statement from the pregnant woman verifying that she is pregnant as a result of rape or incest, that she complied with the reporting requirements, and that she is aware that false reporting is punishable by law; and (3) the Commonwealth must verify with a law enforcement agency or child protective service agency that the report was made. It can reasonably be argued that these requirements can be insurmountable for a victim of rape or incest who may be traumatized by the event. We are aware that rape is a vastly underreported crime, and it can be reasonably argued that reporting requirements such as Pennsylvania's can substantially deter some women from receiving services intended to be available to them under the statute.
 
 
 53
 The Secretary of HHS bears the responsibility of reconciling these competing interests in the statute. The Supreme Court has noted that "[p]erhaps appreciating the complexity of what it had wrought, Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the [Medicaid] Act." Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981). The Secretary has concluded that these competing interests are best reconciled if state reporting requirements contain a waiver provision allowing a treating physician to certify that the woman was unable to comply with reporting requirements for physical or psychological reasons.
 
 
 54
 The Director of HCFA explained this point in her December 1993 directive to all state Medicaid directors:
 
 
 55
 As with all other mandatory medical services for which Federal funding is available, States are required to cover abortions that are medically necessary.... States may impose reasonable reporting or documentation requirements on recipients or providers, as may be necessary to assure themselves that an abortion was for the purpose of terminating a pregnancy caused by an act of rape or incest. States may not impose reporting or documentation requirements that deny or impede coverage for abortions where pregnancies result from rape or incest. To insure that reporting requirements do not prevent or impede coverage for covered abortions, any such reporting requirement must be waived and the procedure considered to be reimbursable if the treating physician certifies that in his or her professional opinion, the patient was unable, for physical or psychological reasons, to comply with the requirement.
 
 
 56
 Letter, (Dec. 28, 1993), App. at 93. See also Letter, (Mar. 25, 1994), App. at 117 (reiterating the need for waiver provision in state-established reporting requirements).
 
 
 57
 Under the Secretary's interpretation, physicians may take into account both the immediate and long-term psychological consequences of reporting rape or incest to authorities that could leave a woman unable to fulfill those reporting requirements. A waiver thus ensures that reporting requirements do not prevent or impede coverage for covered abortions. Without Pennsylvania's assurance that it will waive the reporting requirements if the woman is physically or psychologically unable to comply, the Pennsylvania Abortion Control Act requirements comprise impermissible eligibility criteria.
 
 
 58
 The December 1993 HCFA directive constituted the Secretary's attempt to give interpretive guidance to the states in advance of their submission of state Medicaid plans.[8] The HCFA directive is an interpretation of the Hyde Amendment mandates as reconciled with the competing interests within the Medicaid statute. Since the directive clarifies and explains existing law, we deem it "interpretive." See Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir.1989) ("If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive."); American Min. Congress v. MSHA, 995 F.2d 1106, 1112 (D.C.Cir.1993) (setting out factors to distinguish between legislative and interpretive rules). As an interpretive rule, the Secretary's pronouncements are exempted from the APA notice-and-comment requirements. 5 U.S.C. Sec. 553(b)(A) (notice requirement does not apply "to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice"). This Court and the Supreme Court have upheld the validity of interpretive rules. Bailey, 885 F.2d at 62; Shalala v. Guernsey Memorial Hospital, --- U.S. ----, ----, 115 S.Ct. 1232, 1237, 131 L.Ed.2d 106 (1995).
 
 
 59
 Courts have long recognized that "considerable weight" must be conferred to an executive department's construction of a statutory scheme which it is entrusted to administer. The Supreme Court has announced that the principle of deference to administrative interpretation:
 
 
 60
 has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.
 
 
 61
 Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984) (citations omitted). Such deference is appropriate here even though the Secretary's interpretation is not contained in a "legislative rule." See, e.g., Health Insurance Ass'n of America v. Shalala, 23 F.3d 412, 424 (D.C.Cir.1994); Hicks v. Cantrell, 803 F.2d 789, 791-92 (4th Cir.1986). Indeed, the Supreme Court recently reversed our decision in Koray v. Sizer, 21 F.3d 558, 562-65 (3d Cir.1994), where we had declined to defer to the Bureau of Prisons' interpretation of 18 U.S.C. Sec. 3585(b). The Supreme Court explained:
 
 
 62
 The Bureau, as the agency charged with administering the credit statute ... has interpreted Sec. 3585(b)'s "official detention" language to require credit for time spent by a defendant under a Sec. 3142(e) "detention order".... As we have explained, ... the Bureau's interpretation is the most natural and reasonable reading of Sec. 3585(b)'s "official detention" language. It is true that the Bureau's interpretation appears only in a "Program Statement"--an internal agency guideline--rather than in "published regulations subject to the rigors of the Administrative Procedur[e] Act, including public notice and comment." 21 F.3d at 562. But BOP's internal agency guideline, which is akin to an "interpretive rule" that "do[es] not require notice-and-comment," Shalala v. Guernsey Memorial Hospital, 514 U.S. ----, ---- [115 S.Ct. 1232, 1239, 131 L.Ed.2d 106] (1995) (slip op., at 11), is still entitled to some deference, cf., Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 157 [111 S.Ct. 1171, 1179, 113 L.Ed.2d 117] (1991), since it is a "permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 [104 S.Ct. 2778, 2782, 81 L.Ed.2d 694] (1984).
 
 
 63
 Reno v. Koray, --- U.S. ----, ---- - ----, 115 S.Ct. 2021, 2026-27, 132 L.Ed.2d 46 (1995) (footnote omitted).
 
 
 64
 The Secretary's reconciliation of the competing interests in the Medicaid statute and Hyde Amendment is reasonable. Because the Secretary's consistent and contemporaneously expressed construction of the Medicaid statute as amended by the Hyde Amendment is a reasonable one, it is accorded considerable weight under principles announced in Chevron.
 
 
 65
 Accordingly, we will defer to the Secretary's interpretation of the Hyde Amendment, and hold that because the Pennsylvania reporting requirements lack a waiver procedure and therefore may deprive eligible women of the benefits which Congress has made available to them, they are to this extent in conflict with federal law and are invalid. See Louisiana Public Service Comm'n. v. F.C.C., 476 U.S. 355, 368-69, 106 S.Ct. 1890, 1898-99, 90 L.Ed.2d 369 (1986) (under the Supremacy Clause, a federal agency acting within the scope of its congressionally delegated authority has the power to preempt state regulation and render unenforceable state laws). Thus, until Pennsylvania, pursuant to state law, adopts a waiver provision in accordance with the Secretary's directive, the Commonwealth is enjoined from enforcing its rape and incest reporting requirements.
 
 
 66
 III. SECOND PHYSICIAN CERTIFICATION REQUIREMENTS
 
 
 67
 Like reporting requirements for abortions where pregnancies result from rape or incest, certification requirements for abortions necessary to save the life of the mother are not expressly addressed in the Hyde Amendment. However, pursuant to the broad authority to promulgate regulations in administering the Medicaid program, see, e.g., Schweiker, 453 U.S. at 43, 101 S.Ct. at 2640, the Secretary, shortly after the passage of the first Hyde Amendment in 1977, promulgated a regulation concerning abortions where the mother's life was endangered. The regulation provides:
 
 
 68
 [Federal funding] is available in expenditures for an abortion when a physician has found, and certified in writing to the Medicaid agency, that on the basis of his professional judgment, the life of the mother would be endangered if the fetus were carried to term.
 
 
 69
 42 C.F.R. Sec. 441.203 (emphasis added). This regulation has not been altered in substance since its initial promulgation.
 
 
 70
 The Secretary construes this regulation to provide if any physician--including a woman's attending physician--certifies that the life of the mother would be endangered, federal funding is "available." Consistent with our holding in Roe v. Casey that states are required by the Medicaid Act to fund all abortion services that are allowed under the Hyde Amendment, the Secretary concludes that a state regulation that attempts, in effect, to require a second physician's certification in addition to a certification given by "a physician" is inconsistent with the regulation.
 
 
 71
 We must give substantial deference to an agency's construction of its own regulation. Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 150-51, 111 S.Ct. 1171, 1175-76, 113 L.Ed.2d 117 (1991); Lyng v. Payne, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986). As the Supreme Court recently announced, courts "must defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.' " Thomas Jefferson University v. Shalala, --- U.S. ----, ---- - ----, 114 S.Ct. 2381, 2386-87, 129 L.Ed.2d 405 (1994) (quoting Gardebring v. Jenkins, 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988)).[9]
 
 
 72
 We believe that the Secretary's construction comports with the plain language of the regulation. The phrase "[Federal funding] is available ... for an abortion when a physician has found and certified [that the mother's life is endangered]" does not limit the class of physicians who have the authority to certify. We believe that this reading of the regulation gives the phrase "a physician" its ordinary and natural meaning. See F.D.I.C. v. Meyer, --- U.S. ----, ---- - ----, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994) ("[W]e construe a statutory term in accordance with its ordinary or natural meaning.").
 
 
 73
 Further, the history of the physician certification regulation indicates that the Secretary intended this construction at the time of the regulation's promulgation. The 1976 Hyde Amendment provided for federal funding "where the life of the mother would be endangered if the fetus were carried to term." Pub.L. No. 94-439, Sec. 209, 90 Stat. 1418, 1434 (1976). The 1976 Hyde Amendment did not require a physician's certification. The Secretary issued a notice of proposed rule-making which stated that:
 
 
 74
 the Department will provide Federal financial participation in the cost of abortions only where the attending physician, on the basis of his or her professional judgment, has certified that the abortion is necessary because the life of the mother would be endangered if the fetus were carried to term.
 
 
 75
 42 Fed.Reg. 40486 (1977) (emphasis added). The Secretary construed this notice as meaning that "in the absence of fraud, the physician's judgment would be conclusive." 43 Fed.Reg. 4574 (1978).
 
 
 76
 In enacting the 1977 Hyde Amendment, Congress retained the 1976 Hyde Amendment language concerning funding for abortions when the mother's life is endangered. Pub.L. No. 95-205, Sec. 101, 91 Stat. 1460 (1977). The Secretary concluded that the failure of Congress to question the manner in which the Secretary had previously implemented the exception, and its reenactment without change, should be understood as congressional approval of the Secretary's interpretation. 43 Fed.Reg. 4574. Thus, notwithstanding Congress' silence, the Secretary's 1977 implementing regulations construed the intent of Congress to be that certification of life endangerment by a physician should be required. 43 Fed.Reg. 4570 (Sec. 50.304). Accordingly, the Secretary's construction of her regulation, 42 C.F.R. Sec. 441.203, as providing for federal funding when "any physician"--including a woman's attending physician--certifies that the life of the mother would be endangered, is consistent with the history of the regulation.
 
 
 77
 The Secretary's construction is also consistent with other requirements of Title XIX and its implementing regulations. Section 1396a(a)(17) mandates that states establish eligibility requirements that are "consistent with the objectives" of Title XIX. 42 U.S.C. Sec. 1396a(a)(17). In Beal v. Doe, the Supreme Court explained that "Title XIX's broadly stated primary objective [is] to enable each state, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services." Beal v. Doe, 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977) (citing 42 U.S.C. Secs. 1396, 1396a(a)(10)). A further objective is to assure that state Medicaid plans are administered "in a manner consistent with simplicity of administration and the best interest of the recipients." 42 U.S.C. Sec. 1396a(a)(19); Hodgson, 614 F.2d at 607. The Secretary's construction of the implementing regulation for the endangerment certification provision could be said to further these objectives. In 1977, in promulgating 42 C.F.R. Sec. 441.203, the Secretary noted:
 
 
 78
 The purpose of the certification requirement is not to enable the Department to question physician judgment, but rather to ensure that physician judgment has in fact been exercised. This is the most efficient manner by which a State agency or a program or project--or the Department in conducting audits or other enforcement reviews--may ascertain that the statutory requirements for a claim for Federal financial participation in an abortion have been met.
 
 
 79
 43 Fed.Reg. 4574. Thus, we will defer to the Secretary's interpretation of her regulation that the sufficient condition triggering eligibility for a Medicaid funded abortion is certification by any physician that a woman's life would be endangered by carrying the fetus to term.
 
 
 80
 In contrast to the Secretary's construction of the federal certification regulation, Pennsylvania's certification requirements narrow the Secretary's criteria. The pertinent part of Sec. 3215(c) of the Pennsylvania Abortion Control Act provides that no state or federal funds will be expended for an abortion, except:
 
 
 81
 When abortion is necessary to avert the death of the mother on certification by a physician. When such physician will perform the abortion or has a pecuniary or proprietary interest in the abortion there shall be a separate certification from a physician who has no such interest.
 
 
 82
 18 Pa.Cons.Stat.Ann. Sec. 3215(c)(1) (emphasis added). Under the Commonwealth's Medicaid scheme, even if the attending physician who is to provide the abortion certifies that the procedure is necessary because of life endangerment, there must be yet another certification. In effect, the Commonwealth's regulation renders the certification of an attending physician irrelevant. This reading is contrary to the Secretary's regulation, which provides that federal funding is available under such circumstances.
 
 
 83
 Accordingly, because the Pennsylvania second-physician certification requirement for abortions necessary to save the life of the mother conflicts with a Medicaid implementing regulation as construed by the Secretary, this requirement is invalid.
 
 CONCLUSION
 
 84
 We hold that the Secretary's construction of the Hyde Amendment is reasonable and requires due deference. Under the Secretary's interpretation, both Sec. 3215(c) and Sec. 3215(j) of the Pennsylvania Abortion Control Act are invalid insofar as they (1) fail to allow for a waiver of the rape and incest reporting requirements in accordance with the HCFA directives and (2) require certification by a second physician in cases where the life of the mother is endangered. Accordingly, we will affirm the order of the district court to the extent that it enjoins the Commonwealth from (1) requiring certification by a second physician, and (2) enforcing its rape and incest reporting requirements until it adopts, pursuant to state law, a waiver in accordance with the HCFA directive. In all other respects, these provisions remain enforceable. We will remand for the entry of an order tailored in accordance with this decision.
 
 
 85
 NYGAARD, Circuit Judge, dissenting.
 
 
 86
 Today, the majority holds that, by the simple expedient of writing a letter, a sub-cabinet-level federal bureaucrat can preempt the statutory enactment of an elected state legislature. It bases its holding on the principle of deference set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and later cases. Because I believe that what the Secretary would have us give her is not deference due, but rather deference run amok, I reach a different result than the majority, and must dissent.[1]
 
 I.
 A.
 
 87
 Federal courts are commanded by Chevron and a host of other cases to give deference to certain legal conclusions of administrative agencies. But deference "cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." BATF v. FLRA, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983); accord EEOC v. Arabian Am. Oil Co. ("ARAMCO"), 499 U.S. 244, 260-62, 111 S.Ct. 1227, 1237, 113 L.Ed.2d 274 (1991) (Scalia, J., concurring) ("deference is not abdication"); St. Luke's Hosp. v. Secretary of Health & Human Servs., 810 F.2d 325, 332 (1st Cir.1987) (quoting BATF ). It is therefore vital that we carefully consider each case to determine whether deference is warranted, and, if so, how much to accord. Anything less has the potential to be judicial abdication rather than judicial review. See Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 914-16 (3d Cir.1981); West v. Bowen, 879 F.2d 1122, 1134 (3d Cir.1989) (Mansmann, J., concurring and dissenting); Hon. Joseph W. Weis, Jr., A Judicial Perspective On Deference to Administrative Agencies: Some Grenades From the Trenches, 2 Admin.L.J. 301, 307 (1988).
 
 B.
 
 88
 The full language of the Hyde Amendment provides as follows:
 
 
 89
 None of the funds appropriated under this Act shall be expended for any abortion except when it is made known to the Federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest.
 
 
 90
 Pub.L. No. 103-112, Sec. 509, 107 Stat. 1082, 1113 (1993). As written, the statutory language neither requires nor forbids state reporting requirements in cases of rape or incest, and the majority quite correctly rejects the position of the providers and the district court that such requirements are per se in conflict with the Hyde Amendment (majority at 178-180). The majority then goes on to hold that we must defer under Chevron to the interpretation of the Director of the Medicaid Bureau that reporting and certification requirements are invalid in the absence of a waiver provision. Id. at 183-185. I believe this to be incorrect.
 
 C.
 
 91
 In Chevron, the Environmental Protection Agency promulgated a legislative rule to define the statutory term "stationary source" as an entire manufacturing plant. The Clean Air Act, while requiring permits for new or modified stationary sources, gave no indication of how such a source should be defined. In approaching the standard for judicial review of the agency's choice, the Supreme Court employed a bifurcated analysis:
 
 
 92
 First, always, is the question of whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 93
 467 U.S. at 842-43, 104 S.Ct. at 2781-82 (footnotes omitted).
 
 
 94
 To recapitulate, "the appropriate level of deference due an agency's construction of a statute that it administers depends on the clarity of the statute." Pennsylvania v. United States Dep't of Health & Human Servs., 928 F.2d 1378, 1383-84 (3d Cir.1991). In Chevron step one, we examine the statutory language to determine whether Congress has directly spoken to the issue; if it has, we do not even proceed to step two. Pennsylvania Medical Soc'y v. Snider, 29 F.3d 886, 902 (3d Cir.1994). Only if Congress has not spoken may we apply step two of the Chevron analysis. And then we are limited to reviewing whether the agency's construction of the statute is "permissible." Before a reviewing court can even reach step two, however, it must find that Congress explicitly or implicitly delegated to the agency the authority to construe the statutory provision at issue. See Adams Fruit Co. v. Barrett, 494 U.S. 638, 649, 110 S.Ct. 1384, 1390, 108 L.Ed.2d 585 (1990) ("[A] precondition to deference under Chevron is a congressional delegation of administrative authority."). I simply do not believe there was a delegation here. See infra part IV.
 
 II.
 A.
 
 95
 The majority, relying on Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir.1989) and American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1112 (D.C.Cir.1993), concludes that the letters constitute validly promulgated interpretive rules rather than legislative rules (majority at 181).[2] I agree reluctantly that, under binding circuit precedent, the letters must be treated as interpretive rules. Were I unfettered by precedent, however, I would conclude that the letters are "spurious rules," entitled to no weight whatsoever, as I shall explain shortly.
 
 
 96
 In Bailey, we opined that "[i]f the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive." 885 F.2d at 62. The majority seems to imply that, because the two letters clarify and explain the already-existing Medicaid Act and Hyde Amendment, they are interpretive. But this reasoning proves too much. Indeed, it is difficult to conceive of any nonprocedural regulation that does not in some way explain or clarify an existing federal statute.
 
 
 97
 The reported decisions have been nearly unanimous in adopting a more restricted definition of what type of rule merely clarifies or explains existing law. If the position the agency takes in its rule flows directly from the statutory language itself, i.e., the court would reach the same construction of the statute even in the absence of the regulation, the rule is interpretive. On the other hand, if the rule exercises a congressional delegation of power to make binding rules that create rights, assign duties or impose obligations, it is legislative. This distinction was aptly explained in Dia Navigation Co. v. Pomeroy, 34 F.3d 1255 (3d Cir.1994), where we stated, relying in part on FLRA v. Dep't of the Navy, 966 F.2d 747, 762 n. 14 (3d Cir.1992) (in banc):
 
 
 98
 The critical difference between legislative and interpretive rules is that the former have the force and effect of law while the latter do not. Stated differently, legislative rules have substantive legal effect, while interpretive rules typically involve construction or clarification of a statute or regulation. If a rule creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive [legislative]. Put yet another way, "what distinguishes interpretive from legislative rules is the legal base upon which the rule rests. If the rule is based on specific statutory provisions, and its validity stands or falls on the correctness of the agency's interpretation of those provisions, it is an interpretive rule. If, however, the rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one." United Technologies Corp. v. EPA, 821 F.2d 714, 719-20 (D.C.Cir.1987).
 
 
 99
 34 F.3d at 1264 (some citations and internal quotation marks omitted).[3] Thus, to the extent the majority purports to hold that any rule that explains or clarifies an existing statute or regulation is interpretive notwithstanding the fact that the duties imposed thereby do not flow directly from the statutory language, its holding contravenes earlier decisions of this court, in violation of Third Circuit Internal Operating Procedure 9.1.
 
 
 100
 American Mining is nothing more than a refinement of the law discussed above; that is to say, for a rule to be legislative and have the force of law, Congress must have delegated legislative power to the agency and the agency must have intended to exercise that power in promulgating its rule. 995 F.2d at 1109. Under this test, to determine whether a rule is legislative or interpretive, a reviewing court uses four factors, any one of which indicates that the rule is legislative. The first, whether in the absence of the rule the agency could not succeed in an enforcement action, id. at 1112, simply restates the law discussed above. The others, which include whether the agency has published its rule in the Code of Federal Regulations, whether the agency has explicitly invoked its legislative authority, or whether the rule amends a prior legislative rule, id., are additional factors indicating that a rule is legislative.B.
 
 
 101
 Under the American Mining test, the two letters at issue here are distinctly legislative in character. Looking only at the plain language of the statute, there is simply no way that the Hyde Amendment itself can be construed to require or forbid reporting and certification requirements, with or without a waiver provision. Even the majority recognizes as much, because it relies entirely on Chevron deference to reach its holding that Pennsylvania law is preempted. See majority at 181-83. In the absence of the two letters, there would be no plausible argument that Pennsylvania's reporting and certification requirements are invalid. Accordingly, the letters fail the American Mining and Dia Navigation tests; they are not interpretive rules.
 
 
 102
 Because the Secretary failed to follow the Sec. 553 notice and comment procedure, however, her two letters, while legislative in character, have no force of law whatsoever. See Chrysler Corp. v. Brown, 441 U.S. at 302-03, 99 S.Ct. at 1718; Alaska v. United States Dep't of Transp., 868 F.2d 441, 445 (D.C.Cir.1989); Charles H. Koch, Jr. & Ronald F. Wright, Jr., Administrative Law and Practice Sec. 3.13, at 49 (Supp.1995). Indeed, as Professor Anthony points out, they are not true legislative rules at all, but rather examples of invalid "spurious rules;" that is, they are rules that go beyond mere interpretation of existing law and purport to have binding effect, yet were not submitted to notice and comment rulemaking. Robert A. Anthony, "Interpretive" Rules, "Legislative" Rules and "Spurious" Rules: Lifting the Smog, 8 Admin. L.J. 1, 9-10, 14 (1994). Discussing American Mining, Professor Anthony argues that any rule meeting any of American Mining's four criteria without being subjected to notice and comment is a spurious rule and has no validity. Id. at 15-22. I agree.
 
 
 103
 Nevertheless, precedent constrains us to treat these two letters as interpretive rules. In Daughters of Miriam Ctr. v. Mathews, 590 F.2d 1250, 1255-56 & n. 9 (3d Cir.1978), we stated that, because the agency's rules were not promulgated in accordance with Sec. 553 of the Administrative Procedure Act, 5 U.S.C. Sec. 553, "they perforce must be considered interpretive rules." We also relied on the agency's characterization of the rules as interpretive. Id. Two years later, we followed the Mathews approach, "tak[ing] the agency at its word" that its rule was interpretive. Cerro Metal Prods. v. Marshall, 620 F.2d 964, 981-82 (3d Cir.1980).[4] Thus, and although I strenuously disagree with the result, under Third Circuit Internal Operating Procedure 9.1 we must treat the agency's two letters as interpretive rules, despite their spurious character. See United States v. Monaco, 23 F.3d 793, 803 (3d Cir.1994).[5]
 
 C.
 
 104
 The fact that we are required to treat the two letters as interpretive rules does not excuse the agency from its failure to follow the notice and comment rulemaking procedure, however. Where, as here, a regulatory agency intends to bind the public or the states, it is incumbent upon it to promulgate a valid legislative rule. As we said in Dia Navigation, the purpose of the Sec. 553 notice and comment procedure is to insure public participation by and fairness to affected parties when lawmaking authority has been delegated to unelected, unrepresentative regulatory agencies. 34 F.3d at 1255 (quoting Batterton v. Marshall, 648 F.2d 694, 703 (D.C.Cir.1980)). It "avoid[s] the inherently arbitrary nature of unpublished determinations." Morton v. Ruiz, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974). Notice and comment also serves the salutary purpose of forcing the agency to educate itself on the facts, issues and policy options available before issuing binding regulations. FLRA, 966 F.2d at 763 (quoting Texaco, 412 F.2d at 744); Batterton v. Marshall, 648 F.2d at 703-04 (same); accord Marshall v. Western Union Tel. Co., 621 F.2d 1246, 1254 (3d Cir.1980); Robert A. Anthony, "Well, You Want the Permit, Don't You?" Agency Efforts to Make Nonlegislative Documents Bind the Public, 44 Admin L.Rev. 31, 32 (1992) [hereinafter Anthony, Agency Efforts]. I can say it no better than Professor Anthony, who states:
 
 
 105
 Values served by the legislative rulemaking process are large ones. Fairness is furthered by giving notice to those who are to be bound, both when the proposed rule is about to be considered and when the final rule is definitively published. The accuracy and thoroughness of an agency's actions are enhanced by the requirement that it invite and consider the comments of all the world, including those of directly affected persons who are able, often uniquely, to supply pertinent information and analysis. The acceptability and therefore the effectiveness of a final rule are elevated by the openness of the procedures through which it has been deliberated and by the public's sense of useful participation in a process that affects them. Its legitimacy rests upon all of these considerations, as well as upon the foundational fact that the agency has observed the procedures laid down by Congress for establishing rules with the binding force of law. The agency's accountability for its rules is deepened by the court-made requirement of a reasoned explanation based upon a substantial rulemaking record.
 
 
 106
 Beyond all of this, the APA rulemaking requirements impose a salutary discipline. That discipline deters casual and sloppy action, and thereby forestalls the confusion and needless litigation that can result from such action. And that discipline reduces tendencies toward over-regulation or bureaucratic overreaching, and discourages low-profile attempts to create practically-binding norms that Congress or the Administration would not have approved.
 
 
 107
 Robert A. Anthony, Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like--Should Federal Agencies Use Them to Bind the Public?, 41 Duke L.J. 1311, 1373-74 (1992), also published as Administrative Conference of the United States, Recommendations and Reports, Report for Recommendation 92-2, 1992 ACUS 71, 136-37.[6]
 
 
 108
 In New Jersey v. Department of Health & Human Servs., 670 F.2d 1262, 1281 (3d Cir.1981), we explained:
 
 
 109
 The APA notice and comment procedures exist for good reason: to ensure that unelected administrators, who are not directly accountable to the populace, are forced to justify their quasi-legislative rulemaking before an informed and skeptical public. When these procedures are not followed in situations where they are in fact applicable, a court promotes neither the agency's ultimate mission nor respect for the law by ignoring the agency's indiscretion or condoning the agency's shortcut.
 
 
 110
 There is indeed a great danger in giving Chevron deference (and often, legislative effect) to rules promulgated without the benefit of notice and comment rulemaking. First of all, it encourages agencies to flout the Administrative Procedure Act and issue binding regulations in informal formats. See Community Nutrition Inst. v. Young, 818 F.2d 943, 953 (D.C.Cir.1987) (Starr, J., concurring and dissenting) (agencies may yield to temptation and issue rules with legislative effect in interpretive formats to avoid scrutiny). After all, once a reviewing court defers to the agency and upholds a rule, as the majority does here, it becomes law without the bother of the agency taking true legislative action. Worse, it results in private parties (and, in this case, the Commonwealth of Pennsylvania) being bound by "a proposition they had no opportunity to shape and will have no meaningful opportunity to challenge when it is applied to them." National Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan, 979 F.2d 227, 240 (D.C.Cir.1992) (citing Anthony, Agency Efforts, supra, at 38; quoting Robert A. Anthony, Which Agency Interpretations Should Bind Citizens and the Courts, 7 Yale J. on Reg. 1, 58 (1990)); see also 1 Kenneth C. Davis & Richard J. Pierce, Administrative Law Treatise Sec. 3.5, at 119-20 (1994) (Chevron deference inappropriate for nonlegislative rules). I find such a result both politically undemocratic and jurisprudentially odious.
 
 III.
 
 111
 The majority, while treating the two letters as interpretive rules, nevertheless gives them full deference under Chevron, a case that arose in the context of a legislative rule and quite different jurisprudential concerns. I believe that this, too, is incorrect.
 
 A.
 
 112
 Before Chevron, the amount of consideration to be given interpretive rules was well-settled. The classic statement from the Supreme Court was given in Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944):
 
 
 113
 We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.
 
 
 114
 This approach was reaffirmed three decades later in General Elec. Co v. Gilbert, 429 U.S. 125, 141-42, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976), where the Court analyzed an EEOC guideline as an interpretive rule under the Skidmore doctrine.[7]
 
 
 115
 Chevron, of course, was a watershed decision in the area of judicial deference to regulatory agencies. Significantly, however, Chevron involved a properly promulgated legislative rule. That case simply did not deal with the level of consideration a court should give to an interpretive rule, and did not overrule Skidmore.
 
 
 116
 Indeed, in the years following Chevron, the Supreme Court has reaffirmed that Skidmore consideration is the appropriate standard of review for interpretive rules. In Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 157, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991), the Court, citing Skidmore, opined that interpretive rules are not "entitled to the same deference as norms that derive from the exercise of the Secretary's delegated lawmaking powers[.]" And in ARAMCO, the Supreme Court again relied upon Skidmore and Gilbert, not Chevron, to determine how much weight to give an interpretive rule. 499 U.S. at 256-58, 111 S.Ct. at 1235;[8] accord Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 463 n. 12, 109 S.Ct. 2558, 2571-72 n. 12, 105 L.Ed.2d 377 (1989) (interpretive rule entitled to less weight, relying on Gilbert ). It is therefore manifest that Skidmore and Gilbert survived Chevron.
 
 
 117
 Recently, in dicta, four panels of this court have questioned whether Skidmore or Gilbert were overruled by Chevron. See E.I. duPont de Nemours & Co. v. Commissioner, 41 F.3d 130, 135-36 n.23 (3d Cir.1994); Sekula v. Federal Deposit Ins. Corp., 39 F.3d 448, 453-54 n.13 (3d Cir.1994); Reich v. Local 30, Int'l Bhd. of Teamsters, 6 F.3d 978, 987 n.14 (3d Cir.1993); International Raw Materials, Ltd. v. Stauffer Chemical Co., 978 F.2d 1318, 1325 n.9 (3d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1588, 123 L.Ed.2d 154 (1993). None of these opinions discussed the effect of Martin or ARAMCO.
 
 
 118
 In fact, in several cases decided after Chevron, we have not given Chevron-style deference to interpretive rules. In Armstead v. United States Dep't of Housing & Urban Dev., 815 F.2d 278, 282 (3d Cir.1987), we stated that interpretive rules are not binding on the agency or the court. Likewise, in American Ambulance Serv., Inc. v. Sullivan, 911 F.2d 901, 908 (3d Cir.1990), we opined that "[i]nterpretive rules are entitled to no more weight on judicial review than their inherent persuasiveness commands" (citing Batterton v. Marshall, 648 F.2d at 705). Indeed, in FLRA, we applied this standard of review to an interpretive rule announced in letter form and refused to give it controlling weight. 966 F.2d at 762-64 & n. 14. I think the above line of cases makes it clear that neither the Supreme Court nor this court has recognized any erosion of Skidmore or Gilbert.
 
 
 119
 In Snider, we refused to apply Chevron, holding that the statute was unambiguous under step one of the test and opining that "[c]omplexity alone is not enough to trigger Chevron." 29 F.3d at 902. We did, however, in evaluating the Secretary's position, look to one of the Skidmore factors to determine how much consideration to give to her interpretation. Because the Secretary had changed her position on the issue, we refused to give her interpretation "any deference," id., although it is perhaps more accurate to say that we gave it consideration but not controlling weight.[9] In a similar vein is Mazza v. Secretary of Health and Human Servs., 903 F.2d 953, 958-59 (3d Cir.1990), in which, citing Skidmore and Gilbert, we rejected an agency interpretation that contradicted its earlier position.
 
 
 120
 One of our cases contains some language that superficially seems to support the majority's position. In Kean v. Heckler, 799 F.2d 895, 902 (3d Cir.1986), we purported to defer under Chevron to an agency interpretation. Yet, we went on to consider factors normally relevant only in a Skidmore- Gilbert analysis, including the Secretary's alleged change in position, the fact that her interpretation was contemporaneous with the enactment of the statute, and the expertise of her agency. Id. at 902-03. Nowhere did we even intimate that Chevron had overruled Skidmore or Gilbert. In any event, even if Kean did hold that Chevron deference is required for agency interpretations, I conclude that it was implicitly overruled by the Supreme Court in Martin and ARAMCO.
 
 
 121
 Many other courts agree that Skidmore- Gilbert is the appropriate standard of review for interpretive rules. In Atchison, T. & S.F. Ry. v. Pena, 44 F.3d 437 (7th Cir.1994) (en banc), cert. granted, --- U.S. ----, 115 S.Ct. 2575, 132 L.Ed.2d 826 (1995), the court, while making clear that an interpretive rule is entitled to some deference, refused to "rubber stamp" the agency's action and rejected the contention that full Chevron deference applies to such rules. Id. at 442. Instead, it applied the Skidmore factors and held that the interpretation deserved no deference.[10] Significantly, the court also held that any deference (consideration) due an interpretation must arise from "the agency's diligent study of the statute and the underlying activity it seeks to regulate." Id. at 443.
 
 
 122
 Similarly, in Doe v. Reivitz, 830 F.2d 1441 (7th Cir.1987), a federal agency sent a letter to state welfare authorities restricting the eligibility of certain benefits from dependents of illegal aliens. The Secretary argued that his regulation was entitled to Chevron deference, but the court disagreed, opining:
 
 
 123
 The documents at issue in this case are interpretive rather than legislative in nature, and under longstanding principles, agency interpretations are not entitled to the same degree of deference commanded by the high-powered regulations in Chevron. The Court in Chevron did not purport to alter the scope of review traditionally accorded interpretive documents.
 
 
 124
 Id. at 1446 (citation omitted). It continued:
 
 
 125
 HHS did not engage in notice-and-comment rule making in issuing its AFDC-UP eligibility policy. The agency cannot now contend that courts must accord to this policy the deference due a legislative rule when the agency has not followed the normal procedures associated with force-of-law rule making.
 
 
 126
 Id. The court then went on to analyze the interpretive rule under the Skidmore doctrine, refusing to give controlling weight to the rule on the grounds that the interpretation was not contemporaneous with the passage of the statute and the agency's reasoning was defective. Id. at 1447-51.[11]
 
 
 127
 Indeed, in the D.C. Circuit, the court of appeals has issued a number of opinions to the effect that interpretive rules do not receive full Chevron deference, but, at most, Skidmore consideration. As one panel said, "[a] binding policy is an oxymoron." Vietnam Veterans of Am. v. Secretary of the Navy, 843 F.2d 528, 537 (D.C.Cir.1988). In Samaritan Health Serv. v. Bowen, 811 F.2d 1524 (D.C.Cir.1987), the court stated:
 
 
 128
 While substantive rules are typically characterized as having the force and effect of law, interpretive rules enjoy a lesser deference--doubtless in part because of the absence of public opportunity to comment.... Any deference that an interpretive rule may claim depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."
 
 
 129
 Id. at 1529 (quoting Skidmore ) (some citations and internal quotation marks omitted); accord American Fed'n of Labor v. Donovan, 757 F.2d 330, 341-42 (D.C.Cir.1985) (interpretive rule, while receiving "some" deference, does not receive full deference); Batterton, 648 F.2d at 702 (nonlegislative rules carry no more weight than their inherent persuasiveness commands).
 
 
 130
 The majority, however, relies on Health Ins. Ass'n of Am., Inc. v. Shalala, 23 F.3d 412, 424 & n. 8 (D.C.Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1095, 130 L.Ed.2d 1064 (1995), for the proposition that Chevron "deference is appropriate even though the Secretary's interpretation is not contained in a 'legislative rule.' " See majority at 182.[12] There, because the parties agreed that Chevron applied, the court did not reach the issue, but stated in dictum that it had "often applied Chevron deference to interpretive rules without comment." Id. at 424 n. 8 (citing two cases).
 
 
 131
 One of the cases the Health Insurance court relied on is Wagner Seed Co. v. Bush, 946 F.2d 918 (D.C.Cir.1991), cert. denied, 503 U.S. 970, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992), in which the EPA issued a rule in a decision letter rather than by notice and comment rulemaking. Id. at 921. The court stated that "it is simply not the law of this circuit that an interpretive regulation does not receive the Chevron deference accorded a legislative regulation." Id. at 922. Nowhere in its opinion, however, did it address its prior contrary holdings, discussed above, and the cases it relied upon are opaque at best concerning deference to interpretive rules. And notably, although Wagner Seed was decided shortly after the Supreme Court's decisions in Martin and ARAMCO, the court addressed neither of these cases in its opinion.
 
 
 132
 The other case cited in Health Insurance is General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1566-67 (D.C.Cir.1984), cert. denied, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). In that case, which was decided only three months after Chevron, the court did apply Chevron deference to an interpretive rule, but again, without analyzing its prior holdings to determine whether they survived Chevron. In any event, General Motors was decided before the Supreme Court's decisions in Martin and ARAMCO and cannot survive them.
 
 
 133
 At best, then, these cases indicate an intra-circuit split of authority in the D.C. Circuit on the question of deference to interpretive rules. Given the weight of authority against granting Chevron deference to interpretive rules, I am not persuaded by Health Insurance and the two cases it cites.
 
 
 134
 As final support for its holding that interpretive rules are entitled to Chevron deference, the majority relies on the Supreme Court's recent decision in Reno v. Koray, --- U.S. ----, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995), rev'g Koray v. Sizer, 21 F.3d 558 (3d Cir.1994). See majority at 182. Careful examination of that case reveals it to be inapposite.
 
 
 135
 In Koray, we held that time served by a defendant in a halfway house may constitute time spent in official detention, entitling him to credit against his sentence under 18 U.S.C. Sec. 3585(b). Id. at 567. We declined to grant full Chevron deference to Bureau of Prisons internal agency guidelines. Id. at 562. We did, however, citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), accord "some deference" to the extent the agency "engaged in the necessary 'reasoned' analysis of this issue." Id. Although that inquiry bears some similarity to a Skidmore analysis, we did not cite or apply Skidmore, Gilbert, Martin, or ARAMCO in Koray. Then, based entirely on the plain language of the statute, we held that the words "official detention" did not mean, as the government argued, "official detention by the Attorney General or the Bureau of Prisons." 21 F.3d at 563-64.
 
 
 136
 Our analysis in Koray was entirely within Chevron step one: whether Congress had plainly spoken to the issue, and the "deference" (really consideration) we gave the agency interpretation was likewise an aid to our step one analysis. See Michael Herz, Deference Running Riot: Separating Interpretation and Lawmaking Under Chevron, 6 Admin.L.J. 187, 208-09 (1992) (Skidmore analysis is a part of Chevron step one). We simply never reached Chevron step two.
 
 
 137
 Neither did the Supreme Court. In reversing our decision, the Court examined a number of related statutes using the phrase "official detention." --- U.S. at ---- - ----, 115 S.Ct. at 2025-26. Based entirely on its construction of Sec. 3585(b) in pari materia with the other statutes and on the legislative history, the Supreme Court concluded that "the Bureau's interpretation is the most natural and reasonable reading of Sec. 3585(b)'s 'official detention' language." Id. at ----, 115 S.Ct. at 2027.
 
 
 138
 The Supreme Court's decision in Koray is a classic Chevron step one holding; the Court construed the statute in accordance with the clear intent of Congress, and concluded that our construction was erroneous. Because the statute was not ambiguous, the Court simply did not reach step two of the Chevron analysis. The Court stated only that the agency's interpretive rule "is still entitled to some deference, since it is a permissible construction of the statute[,]"[13] id. (emphasis added) (citations and internal quotation marks omitted), opining that "it would be too much to say that the statute cannot bear the interpretation adopted by the Bureau." Id. (citation and internal quotation marks omitted).[14]
 
 
 139
 It is important not to read too much into this language, however. Both courts agreed that the agency's interpretation was entitled to "some deference." --- U.S. at ----, 115 S.Ct. at 2027; 21 F.3d at 562. I believe all the Supreme Court told us in Koray was that, because the agency's construction of the statute best reflected the clear intent of Congress, we should have given it controlling weight. Koray did not hold that the statute was ambiguous or that there was a delegation of authority to the agency to fill a gap in the statutory scheme. Because of that, as discussed earlier, Koray simply is not a step two case.[15]
 
 
 140
 In addition, the Koray Court did not overrule, limit or even criticize its earlier decisions in Skidmore, Morton, Gilbert, Martin or ARAMCO. I therefore disagree with the majority's implicit assertion that the Supreme Court in Koray overruled all of those cases sub silentio. Had the Supreme Court intended to make such a sweeping change in administrative law jurisprudence, it would have done so explicitly. The Supreme Court's opinion in Koray cannot support such a conclusion. See Neely v. Club Med Management Servs., Inc., Nos. 93-2069, 93-2102, --- F.3d ----, 1995 U.S.App. LEXIS 19904, * 26, 1995 WL 442169, * 9 (3d Cir. July 26, 1995) (in banc) (mere ambiguity in Supreme Court opinion insufficient to change existing decisional law). I therefore conclude that Skidmore and Gilbert, not Chevron step two, provide the appropriate standard of review for interpretive rules.
 
 B.
 
 141
 Under the standard enunciated in Skidmore, these two letters, to which we are asked to defer, do not fare well. In Skidmore, the Supreme Court focused on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140, 65 S.Ct. at 164. It is also appropriate to consider whether the agency's interpretation is contemporaneous with the passage of the statute and has been in long use. Davis v. United States, 495 U.S. 472, 484, 110 S.Ct. 2014, 2022, 109 L.Ed.2d 457 (1990). Finally, we may examine whether the agency has developed expertise over the subject matter at issue. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 651-52, 110 S.Ct. 2668, 2679, 110 L.Ed.2d 579 (1990) (agency expertise is a principal justification for deference); Kelley, 17 F.3d at 842; Colorado Pub. Utilities Comm'n v. Harmon, 951 F.2d 1571, 1578-79 (10th Cir.1991); West, 879 F.2d at 1136-37 (Mansmann, J., concurring and dissenting); Capitano, 732 F.2d at 1076; Mathews, 590 F.2d at 1259.
 
 
 142
 First of all, it is apparent that the agency did not thoroughly consider the issue of reporting and certification requirements. In the two letters to state Medicaid directors, the agency provides no explanation at all why states must have a waiver provision. Other than the explanation it offers in its amicus brief (which we requested), the agency offers no justification for its rule. This is similar to the situation we faced in Mathews, 590 F.2d at 1258, where we rejected the agency's interpretation.
 
 
 143
 Even in her brief, the Secretary states only that lack of a waiver provision could become an "insuperable barrier" to victims of rape and incest seeking Medicaid-funded abortions, relying entirely on the fact that rape is a "vastly underreported" crime. This is both speculative and shallow reasoning, and, in any event, is nothing more than a litigating position entitled to no weight. See Martin, 499 U.S. at 156-57, 111 S.Ct. at 1179; Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S.Ct. 468, 473-74, 102 L.Ed.2d 493 (1988). Fundamentally, I remain unconvinced that the Secretary has really taken the necessary "hard look" at this question. Cf. Greater Boston Television Corp. v. Federal Communications Comm'n, 444 F.2d 841, 851-52 (D.C.Cir.1970) ("hard look" necessary to satisfy reviewing court that agency action not based on "impermissible whim, improper influence or misplaced zeal"), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).
 
 
 144
 Second, although the agency's position is temporally fairly close to the enactment of the 1994 Hyde Amendment, it is not one of long-standing. This factor, accordingly, does not favor according any deferential weight to the agency's interpretation. See Davis, 495 U.S. at 484, 110 S.Ct. at 2022; Kelley, 17 F.3d at 842 (refusing to give weight to contemporaneous interpretation not in long use); see also Pena, 44 F.3d at 445 (Easterbrook, J., concurring) (long-standing interpretations entitled to more weight only because they shed light on the meaning of the statute when enacted); Richard A. Posner, The Federal Courts: Crisis and Reform 279-80 (1985) (view of current administration, in the absence of long-standing, consistent interpretation, not entitled to weight).
 
 
 145
 Finally, I turn to the issue of agency expertise. If this case involved any of the issues we typically review under the Medicaid Act, I would be the first to say that the Secretary has developed a tremendous amount of it. That is not the case here, however. Under the Hyde Amendment, funding for abortion, even in cases of rape and incest, was forbidden from 1982 through 1993. Quite simply, abortion of pregnancies caused by rape and incest is not something the agency has had to deal with within recent institutional memory. And it certainly is no expert on the criminology of rape and incest reporting. It therefore lacks any comparative advantage vis-a-vis this court with respect to the issue at hand. I would therefore not accord the agency's interpretation controlling weight. See Hi-Craft Clothing, 660 F.2d at 915; Mathews, 590 F.2d at 1259; Director, OWCP v. Mangifest, 826 F.2d 1318, 1333-34 (3d Cir.1987) (Weis, J., concurring).
 
 C.
 
 146
 My conclusion is philosophically annealed by the fact that the agency's letters do not merely regulate a private party; they attempt to preempt a state statute. One of the reasons for Chevron deference is that "federal judges--who have no constituency--have a duty to respect legitimate policy choices made by those who do." Chevron, 467 U.S. at 866, 104 S.Ct. at 2793. The argument is that agencies, which at least in theory are indirectly responsive to majoritarian pressure, are more legitimate policy makers than Article III courts. With respect to regulation of private party conduct, that theory holds reasonably true; agencies are at least the delegates of the Congress and are often the subordinates of the Executive. It is no secret, however, that what is true in theory may be less so in practice; because of superior expertise and "agency capture," actual agency action may be less majoritarian than we might hope. See Sanford N. Caust-Ellenbogen, Blank Checks: Restoring the Balance of Powers in the Post-Chevron Era, 32 B.C.L.Rev. 757, 814 (1991). Even so, it is reasonable in such circumstances to favor the policy choices of agency heads rather than judges.
 
 
 147
 That situation shifts considerably, however, in the context of preemption. There, the two alternative policymakers are: (1) unelected and only theoretically accountable bureaucrats on one side of the balance; and (2) the elected state legislators on the other. That is our case, and I think the balance tips sharply in favor of upholding state law, not a federal agency's interpretation. Under the Supremacy Clause, a federal agency only has the power to preempt when it clearly, conscientiously and lawfully exercises its delegated authority under Sec. 553 of the APA, not when it issues an interpretive rule. Cf. Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503, 108 S.Ct. 1350, 1355, 99 L.Ed.2d 582 (1988) ("a clear and manifest [federal] purpose is always required" for preemption); Ray v. Atlantic Richfield Co., 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978) (same).
 
 
 148
 Indeed, under the law of this circuit, an interpretive rule cannot preempt state law. See United States v. Walter Dunlap & Sons, Inc., 800 F.2d 1232, 1239 (3d Cir.1986) ("Because the regulations on which FmHA relies do not have the force of a congressional directive and because there is no indication that Congress intended an agency regulation to supersede long-standing uniform state law in this area, we decline to accept the government's position that the regulations control."). This makes good logical sense, because it takes law to displace law, and an interpretive rule lacks the force of law. Other courts and commentators appear to be in accord. See Koch & Wright, supra, Sec. 3.59, at 73-74 (Supp.1995) (citing South Central Bell Tel. v. Louisiana Pub. Serv. Comm'n, 744 F.2d 1107 (5th Cir.1984), vacated on other grounds, 476 U.S. 1166, 106 S.Ct. 2884, 90 L.Ed.2d 972 (1986); New England Tel. & Tel. Co. v. Public Utilities Comm'n, 742 F.2d 1, 11 (1st Cir.1984), cert. denied, 476 U.S. 1174, 106 S.Ct. 2902, 90 L.Ed.2d 988 (1986)).
 
 IV.
 
 149
 That brings me finally to Pennsylvania's second physician certification requirement. Unlike the agency's two letters explaining its interpretation of reporting and certification requirements, here the Secretary promulgated a valid legislative rule with the purported force of law. See 42 C.F.R. Sec. 441.203 (speaking in terms of "a physician"). Her interpretation, therefore, would appear to flow directly from the text of her regulation, merely reminding states of an existing duty.
 
 
 150
 I do not believe, however, that Congress ever delegated any authority for the Secretary to make such a rule. I recognize that the Secretary has "exceptionally broad authority" to interpret the Medicaid Act itself, Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); see majority at 181, but the Medicaid Act is not at issue here. The statutory text under interpretation is the Hyde Amendment to the appropriations bill that funds the Medicaid program, and there is not one scintilla of evidence in the Hyde Amendment that Congress intended the Secretary to interpret either the scope and extent of her appropriation or the validity of state-imposed second physician certification requirements. Unlike most substantive statutes administered by regulatory agencies, the Hyde Amendment contains no provision enabling the Secretary to make regulations with the force of law. At best, it is silent on the issue. The mere fact of legislative silence, however, does not necessarily imply the existence of a deliberate "gap" in the statute, much less a gap that we must infer Congress intended the Secretary to fill through administrative regulation.[16] Because there was no delegation, the regulation upon which the majority relies is properly treated only as an interpretive rule. See ARAMCO, 499 U.S. at 256-58, 111 S.Ct. at 1235; Gilbert, 429 U.S. at 141-42, 97 S.Ct. at 410-11; Batterton, 648 F.2d at 705.
 
 
 151
 Applying a Skidmore analysis to 42 C.F.R. Sec. 441.203, it would probably, under normal circumstances, be entitled to controlling weight. The regulation, after all, was enacted soon after the first Hyde Amendment was passed in 1977, and has not changed since. Moreover, because the Hyde Amendment has always permitted funding for Medicaid abortions where the life of the mother would otherwise be endangered, the agency does have considerable expertise in this area. Ordinarily, then, I would agree with the majority that the Secretary's interpretation is controlling.
 
 
 152
 As I have already discussed in Part III(C), however, this is a preemption case, and an interpretive rule cannot preempt state law. Dunlap, 800 F.2d at 1239. Accordingly, I would uphold Pennsylvania's second physician certification requirement.
 
 V.
 
 153
 Because the majority incorrectly defers under Chevron to the Secretary's interpretations, and because there is no basis for its holding in the Hyde Amendment itself, I dissent.
 
 
 
 [1]
 The original Hyde Amendment, enacted in 1976, limited federal funding to abortions where "the life of the mother would be endangered if the fetus were carried to term." Pub.L. No. 94-439, Sec. 209, 90 Stat. 1418, 1434 (1976). The Hyde Amendment for the following fiscal year expanded the funding to include abortions for victims of rape and incest as well as "instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians." Pub.L. No. 95-205, Sec. 101, 91 Stat. 1460 (1977). From that year through 1981, the Hyde Amendment provided for reimbursement for abortions when a pregnancy resulted from rape or incest. The rape and incest provision was eliminated from the Hyde Amendment from 1982 until the appropriations bill for fiscal year 1994
 
 
 [2]
 The 1995 Hyde Amendment is identical in language to the 1994 version. Pub.L. No. 103-333, Sec. 509, 108 Stat. 2539, 2573 (1994)
 
 
 [3]
 HCFA reaffirmed its position regarding the Hyde Amendment in another letter to state Medicaid Directors, which stated:
 HCFA will not establish a timeframe within which cases of rape or incest must be reported to a law enforcement or other agency. State law or policy should dictate when and to whom a rape or a case of incest must be reported. However, as noted in my December 28 letter, the State-established reporting requirements may not serve as an additional coverage requirement to deny or impede payment for abortions where pregnancies result from rape or incent (sic).
 The State must establish procedures which permit the reporting requirements to be waived, and the procedure reimbursed, if the treating physician certifies that, in his or her professional opinion, the patient was unable, for physical or psychological reasons, to comply with the reporting requirements.
 Letter, from Sally K. Richardson, Director, Medicaid Bureau, to All State Medicaid Directors (Mar. 25, 1994) (emphasis added), App. at 116-17.
 
 
 [4]
 Section 3215(j) of the Pennsylvania Abortion Control Act provides:
 No Commonwealth agency shall make any payment from Federal or State funds appropriated by the Commonwealth for the performance of any abortion pursuant to subsection (c)(2) or (3) unless the Commonwealth agency first:
 (1) receives from the physician or facility seeking payment a statement signed by the physician performing the abortion stating that, prior to performing the abortion, he obtained a non-notarized, signed statement from the pregnant woman stating that she was a victim of rape or incest, as the case may be, and that she reported the crime, including the identity of the offender, if known, to a law enforcement agency having the requisite jurisdiction or, in the case of incest where a pregnant minor is the victim, to the county child protective service agency and stating the name of the law enforcement agency or child protective service agency to which the report was made and the date such report was made;
 (2) receives from the physician or facility seeking payment, the signed statement of the pregnant woman which is described in paragraph (1). The statement shall bear the notice that any false statements made therein are punishable by law and shall state that the pregnant woman is aware that false reports to law enforcement authorities are punishable by law; and
 (3) verifies with the law enforcement agency or child protective service agency named in the statement of the pregnant woman whether a report of rape or incest was filed with the agency in accordance with the statement.
 The Commonwealth agency shall report any evidence of false statements, of false reports to law enforcement authorities or of fraud in the procurement or attempted procurement of any payment from Federal or State funds appropriated by the Commonwealth pursuant to this section to the district attorney of appropriate jurisdiction and, where appropriate, to the Attorney General.
 
 
 [18]
 Pa.Cons.Stat.Ann. Sec. 3215(j)
 
 
 [5]
 Section 3215(c) of the Pennsylvania Abortion Control Act provides, in pertinent part:
 No Commonwealth funds and no Federal funds which are appropriated by the Commonwealth shall be expended by any State or local government agency for the performance of abortion, except:
 (1) When abortion is necessary to avert the death of the mother on certification by a physician. When such physician will perform the abortion or has a pecuniary or proprietary interest in the abortion there shall be a separate certification from a physician who has no such interest.
 (2) When abortion is performed in the case of pregnancy caused by rape which, prior to the performance of the abortion, has been reported, together with the identity of the offender, if known, to a law enforcement agency having the requisite jurisdiction and has been personally reported by the victim.
 (3) When abortion is performed in the case of pregnancy caused by incest which, prior to the performance of the abortion, has been personally reported by the victim to a law enforcement agency having the requisite jurisdiction, or, in the case of a minor, to the county child protective service agency and the other party to the incestuous act has been named in such report.
 
 
 [18]
 Pa.Cons.Stat.Ann. Sec. 3215(c)
 
 
 [6]
 The providers also challenged the second-physician certification provision as violative of Title XIX and the Due Process Clause of the Fourteenth Amendment. The district court did not address these additional claims
 
 
 [7]
 The legislative history of this provision establishes that Congress added it to ensure that states would not impose bureaucratic and complicated mechanisms for determining eligibility that would deter recipients from obtaining care
 This provision was included in order to provide some assurance that the States will not use unduly complicated methods of determining eligibility which have the effect of delaying in an unwarranted fashion the decision on eligibility for medical assistance or that the States will not administer the provisions for services in a way which adversely affects the availability or the quality of the care to be provided. The committee expects that under this provision, the States will be eliminating unrewarding and unproductive policies and methods of investigation and that they will develop such procedures as will assure that the most effective working relationships with medical facilities, practitioners, and suppliers of care and service in order to encourage their full cooperation and participation in the provision of services under the State plan.
 S.Rep. No. 404, 89th Cong., 1st Sess. 76, reprinted in 1965 U.S.C.C.A.N. 1943, 2017.
 
 
 [8]
 We are aware of the related action, Ridge v. Shalala, No. 94-7751, which is currently pending in this Court, in which the Commonwealth is challenging HHS's "waiver" requirement as violative of the Administrative Procedures Act. The district court dismissed the action on jurisdictional grounds because the Secretary has not yet called for a hearing nor issued a decision about the conformity of Pennsylvania's plan with the Hyde Amendment. Casey v. Shalala, No. 94-390 (M.D.Pa. Nov. 28, 1994)
 
 
 [9]
 In Gardebring, the Supreme Court, while recognizing that the Secretary had not taken a position until that litigation, held that:
 when it is the Secretary's regulation that we are construing, and when there is no claim in this Court that the regulation violates any constitutional or statutory mandate, we are properly hesitant to substitute an alternative reading for the Secretary's unless that alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.
 485 U.S. at 430, 108 S.Ct. at 1314. Thus, we will defer to the Secretary's construction of her own regulation even if the interpretation is put forth in litigation.
 
 
 [1]
 My reasons for doing so are, regrettably for the readers who must digest them whole, somewhat lengthy and involved. As Justice Scalia once said, "Administrative law is not for sissies--so you should lean back, clutch the sides of your chairs, and steel yourselves...." Hon. Antonin Scalia, Judicial Deference to Administrative Interpretations of Law, 1989 Duke L.J. 511, 511
 
 
 [2]
 This conclusion is vital to the majority's holding. Under the Administrative Procedure Act, rules may be either legislative or nonlegislative. A legislative rule must be promulgated according to the notice and comment procedures of 5 U.S.C. Sec. 553, which the Secretary did not do in this case. E.g., Beazer E., Inc. v. United States Envtl. Protection Agency, 963 F.2d 603, 606 (3d Cir.1992); Texaco, Inc. v. Federal Power Comm'n, 412 F.2d 740, 742 (3d Cir.1969). Indeed, a legislative rule which is not promulgated in accordance with the requirements of the APA is not entitled to have the force of law. See, e.g., Chrysler Corp. v. Brown, 441 U.S. 281, 302-03, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979)
 
 
 [3]
 Accord Shalala v. Guernsey Mem. Hosp., --- U.S. ----, ----, 115 S.Ct. 1232, 1239, 131 L.Ed.2d 106 (1995) (a rule that effects a change in the law is legislative and must comply with APA rulemaking requirements); Beazer E., 963 F.2d at 606 (interpretive rule only reminds parties of existing duties); Texaco, 412 F.2d at 744 (general statements of policy impose no rights or obligations). This distinction is equally true in the case of federal-state cooperative programs, such as Medicaid. See Ohio Dep't of Human Servs. v. United States Dep't of Health & Human Servs., 862 F.2d 1228, 1229-30 (6th Cir.1988) (HCFA Medicaid rule not interpretive); Cabais v. Egger, 690 F.2d 234, 238-239 (D.C.Cir.1982) (federal regulation of state-administered program not interpretive)
 
 
 [4]
 See also Ohio Dep't of Human Servs., 862 F.2d at 1234-35 (HCFA Medicaid rule was legislative in character but was treated for deference purposes as interpretive)
 
 
 [5]
 There is some evidence that the law of the circuit has evolved over the fifteen years since Cerro and Mathews. In Limerick Ecology Action, Inc. v. United States Nuclear Regulatory Comm'n, 869 F.2d 719 (3d Cir.1989), we stated that:
 The agency's label of an agency action, although one factor to be considered, does not control whether the action is in fact a [legislative] rulemaking. Instead, it is the substance of what the agency has purported to do and has done which is decisive.
 Id. at 734 (citation to Cerro and other cases omitted). It is apparent from this language that the Limerick court, like the courts in Dia Navigation and American Mining, took a functional approach to distinguishing legislative from interpretive rules. Nevertheless, there is no evidence in any of our cases, including FLRA (which was heard in banc), that the Cerro- Mathews approach has been overruled.
 
 
 [6]
 The Administrative Conference of the United States adopted Professor Anthony's recommendation. 1992 ACUS 5, 41 Duke L.J. at 1384; see 1 C.F.R. Sec. 305.92-2. Recommendation 92-2 provides that "[a]gencies should not issue statements of general applicability that are intended to impose binding substantive standards or obligations upon affected persons without using legislative rulemaking procedures (normally including notice-and-comment)."
 
 
 [7]
 Accord Batterton v. Francis, 432 U.S. 416, 424 & n.9, 97 S.Ct. 2399, 2405-06 & n.9, 53 L.Ed.2d 448 (1977); Morton, 415 U.S. at 237, 94 S.Ct. at 1075; New Jersey, 670 F.2d at 1282; Cerro, 620 F.2d at 980-82; Baker v. Otis Elevator Co., 609 F.2d 686, 692 (3d Cir.1979); Mathews, 590 F.2d at 1258
 
 
 [8]
 Justice Scalia concurred, opining that the interpretive rule was entitled to Chevron deference and that Gilbert was "an anachronism[.]" Id. at 258-60, 111 S.Ct. at 1236. It is thus clear that the majority held that Chevron was not applicable
 
 
 [9]
 We give consideration to the agency's interpretation (which many courts refer to as deference), then we decide how much weight the interpretation should receive. To say that we give it "no deference" implies that we do not even consider it, which is not the case
 
 
 [10]
 Again, it would have been more accurate if the court had said that the interpretation would not be given controlling weight rather than it would be given no deference
 
 
 [11]
 The overwhelming majority of the other federal courts of appeals has followed essentially the same reasoning. See Kelley v. E.I. DuPont de Nemours & Co., 17 F.3d 836, 841-42 (6th Cir.1994) (policy statements and interpretive rulings not entitled to Chevron deference but are analyzed under Skidmore factors); Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation, 17 F.3d 521, 534-35 (2d Cir.1994) (no Chevron deference to EPA advisory circular); Travelstead v. Derwinski, 978 F.2d 1244, 1250 (Fed.Cir.1992) (interpretive rules receive only Skidmore consideration); Dalheim v. KDFW-TV, 918 F.2d 1220, 1228 (5th Cir.1990) (interpretive rules not binding, relying on Skidmore ); Ohio Dep't of Human Servs., 862 F.2d at 1235 (6th Cir.) (according only Skidmore consideration to interpretive rule; thoroughness evident in agency reasoning was "most unimpressive"); Paxton v. Secretary of Health & Human Servs., 856 F.2d 1352, 1356-57 (9th Cir.1988) (interpretive rule not given Chevron deference); St. Luke's Hosp., 810 F.2d at 331-32 (1st Cir.) (interpretation of even ambiguous statute given only Skidmore consideration); Capitano v. Secretary of Health & Human Servs., 732 F.2d 1066, 1075-76 (2d Cir.1984) (rule treated as interpretive failed Skidmore analysis); Frank Diehl Farms v. Secretary of Labor, 696 F.2d 1325, 1329-30 (11th Cir.1983) (interpretive rules get less deference than legislative rules, citing Skidmore )
 
 
 [12]
 The majority also relies on Hicks v. Cantrell, 803 F.2d 789, 793-94 (4th Cir.1986). There, and with very little analysis, the court held that Chevron deference was owed to an agency interpretation. Because of Hicks' minimal reasoning and its conflict with the overwhelming majority of courts that have considered the same issue (including the Supreme Court), I simply would not follow it
 
 
 [13]
 This language is taken from Chevron, 467 U.S. at 843, 104 S.Ct. at 2782, where the Court sets forth step two of the Chevron test. Because Koray is a step one case, I conclude that the use of that quotation amounts to, at most, an "imprecision in the Court's language," not an implicit part of its holding. See Pope v. East Brunswick Bd. of Educ., 12 F.3d 1244, 1250 (3d Cir.1993)
 
 
 [14]
 The Court quoted Sullivan v. Everhart, 494 U.S. 83, 91-92, 110 S.Ct. 960, 965-66, 108 L.Ed.2d 72 (1990). There, recipients of federal benefits challenged the Secretary's "netting" regulations, which were promulgated as legislative rules. The recipients proffered a plausible construction but the court held--deferring under step two of Chevron--that at most, the recipients proved that the statute could bear their construction, but not that it could not bear the Secretary's construction. That, according to the Court, was insufficient. While the Court's reasoning was certainly applicable to a step two case, Koray and this case arise under Chevron step one, which has a less deferential standard
 
 
 [15]
 Compare Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, --- U.S. ----, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). There, the agency promulgated a proper legislative rule giving further meaning to the statutory term "take" under the Endangered Species Act, 16 U.S.C. Sec. 1531 et seq. While the Supreme Court engaged in an analysis of the text and legislative history of the Act, in the final analysis, it decided that "Congress did not unambiguously manifest its intent" to contradict the agency's view of the statute. The Court accordingly deferred to the "reasonable" interpretation of the agency. --- U.S. at ---- - ----, 115 S.Ct. at 2416-17. Sweet Home, in contrast to Koray, clearly implicated Chevron step two
 
 
 [16]
 See, e.g., Railway Labor Executives' Ass'n v. National Mediation Bd., 29 F.3d 655, 671 (D.C.Cir.1994) (en banc) (presuming a delegation would enable agencies to "enjoy virtually limitless hegemony"); West, 879 F.2d at 1138 (Mansmann, J., concurring and dissenting) (mere silence or ambiguity does not automatically imply delegation to the agency); Weis, supra, at 305 ("If Congress has not clearly delegated a properly circumscribed power, then the agency should not obtain untrammeled discretion through legislative silence."); Herz, supra at 204 ("Courts should not equate a mere lack of clarity with a delegation of decision-making authority to the agency."); Cass R. Sunstein, Interpreting Statutes in the Regulatory State, 103 Harv.L.Rev. 405, 445 (1989) ("An ambiguity is simply not a delegation of law-interpreting power."); Cass R. Sunstein, Constitutionalism After the New Deal, 101 Harv.L.Rev. 421, 467 (1987) (same)